**** CORRECTED COPY ****

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

### UNITED STATES

**v.**

### Lieutenant Colonel JAMES W. RICHARDS IV
### United States Air Force

### ACM 38346

### 2 May 2016

Sentence adjudged 21 February 2013 by GCM convened at Tyndall Air Force Base, Florida. Military Judge: Mark L. Allred and Vance H. Spath (*Dubay* hearing).

Approved Sentence: Dismissal, confinement for 17 years, and forfeiture of all pay and allowances.

Appellate Counsel for Appellant: Major Thomas A. Smith and William E. Cassara (civilian counsel) (argued).

Appellate Counsel for the United States: Major Thomas J. Alford (argued); Major Mary Ellen Payne; Captain Richard Schrider, Captain Collin Delaney and Gerald R. Bruce, Esquire.

Before

MITCHELL, HECKER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

MITCHELL, Chief Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of one specification of possessing digital images of minors engaging in sexually explicit conduct, six specifications of committing an indecent act with a male under 16 years of age, and four specifications of failing to obey a lawful order, in violation of Articles 92 and 134, UCMJ, 10 U.S.C. §§ 892, 934. Pursuant to defense

motions, the military judge dismissed several other specifications that alleged various offenses. The military judge sentenced Appellant to a dismissal, confinement for 17 years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

Appellant's assignment of errors raises 15 issues:

I. The military judge erred in failing to suppress evidence based on various alleged Fourth Amendment[1] violations;

II. Appellant received ineffective assistance of counsel when his trial defense counsel disclosed confidential information to the trial counsel that led to the discovery of evidence used against Appellant at trial;

III. Appellant's right to speedy trial under Rule for Courts-Martial (R.C.M.) 707 was violated;

IV. Appellant was denied his right to a speedy trial under Article 10, UCMJ, 10 U.S.C. § 810;

V. The military judge abused his discretion by failing to exclude Appellant's ex-wife's testimony under Mil. R. Evid 404(b);

VI. The military judge abused his discretion in not suppressing evidence of other sexual offenses under Mil. R. Evid. 413;

VII. The evidence is legally and factually insufficient to support the specification of possessing digital images of minors engaging in sexually explicit conduct;

VIII. The orders of which Appellant was convicted of violating were not lawful;

IX. One particular no-contact order was not lawful because it violated Appellant's right to be protected from compulsory self-incrimination and interfered with his right to represent himself in criminal proceedings;

X. Two specifications of indecent acts represented an unreasonable multiplication of charges;

XI. The military judge erred in failing to award Appellant pretrial confinement credit for violations of R.C.M. 305(i);

---

[1] U.S. CONST. amend IV.

XII. The military judge erred in calculating the maximum punishment for the specification of possessing digital images of minors engaging in sexually explicit conduct;

XIII. The record of trial is not substantially complete because a defense motion is missing;

XIV. The cumulative effect of the errors in this case denied Appellant a fair trial; and

XV. Appellant received ineffective assistance of counsel when his defense counsel failed to raise numerous alleged legal errors to the convening authority in clemency.

Two months after filing his assignment of errors, Appellant raised 16 additional issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). This court accepted the late *Grostefon* submissions. These issues allege:

XVI. The charges and specifications were improperly referred to a general court-martial under R.C.M. 201(b)(3) as a result of the convening authority's failure to ensure the requirements imposed under R.C.M. 601(d)(2)(A) were first satisfied;

XVII. Appellant was denied effective assistance of counsel by civilian defense counsel's failure to object to the convening authority's exclusion of time for speedy trial purposes in the Article 32, 10 U.S.C. § 832, investigating officer's appointment memorandum;

XVIII. Appellant was denied effective assistance of counsel as a result of civilian defense counsel's failure to file objections to the Article 32, UCMJ, resulting in the military judge's ruling on waiver under R.C.M. 405(k);

XIX. Appellant's conviction for possessing digital images of minors engaging in sexually explicit conduct is barred by the statute of limitations;

XX. The military judge erred in denying Appellant's request for the detailing of a particular individual military defense counsel;

XXI. The military judge erred in admitting the testimony of a witness under Mil. R. Evid. 702;

XXII. Appellant was denied effective assistance of counsel by trial defense counsel's failure to object to the testimony of a witness under Mil. R. Evid. 702;

XXIII. The military magistrate did not have a substantial basis for determining probable cause existed for a search authorization for Appellant's home and automobile;

XXIV. Appellant was denied effective assistance of counsel by trial defense counsel's failure to object to evidence seized as a result of a search authorization for Appellant's home and automobile;

XXV. The evidence presented by the Government with respect to three of the specifications for violating a lawful order was legally and factually insufficient to support the findings;

XXVI. Appellant was denied effective assistance of counsel by trial defense counsel's failure to object to two of the indecent acts specifications as an unreasonable multiplication of charges;

XXVII. Appellant was subject to illegal pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813;

XXVIII. Appellant was subject to conditions while confined by the Air Force post-trial at a county jail that constituted a violation of Article 55, UCMJ, 10 U.S.C. § 855;

XXIX. The military magistrate did not have a substantial basis for determining the existence of probable cause for a search authorization of Appellant's residence;

XXX. The military judge erred in calculating the maximum punishment for the specification of possessing digital images of minors engaging in sexually explicit conduct; and

XXXI. Appellant was denied his right to freedom from unreasonable search and seizure, citing the same general issues raised in Issue I.

This court granted a motion for oral argument on one aspect of Issue I (dealing with the Government's warrantless placement of a global positioning system (GPS) device on Appellant's car) and Issue II (ineffective assistance of counsel when trial defense counsel allegedly disclosed confidential information to the trial counsel that led to the discovery of evidence used against Appellant at trial). We also sua sponte notified the parties that

questions at oral argument might include another aspect of Issue II (whether law enforcement investigators' searches remained within the scope of the warrant) and Issue V (involving the admission of testimony by Appellant's ex-wife). The first oral argument was held on 17 February 2015.[2]

Following oral argument, we ordered a post-trial hearing under *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967), to resolve disputed factual issues raised by declarations the parties submitted concerning Issue II. We held a second oral argument on this case on 29 September 2015.[3] After receiving the results of the post-trial hearing, allowing additional appellate submissions from the parties, and benefiting from the presentations at oral argument, we find no error materially prejudicial to a substantial right of Appellant. Our reasoning on several of the assignments of error is further detailed in the following opinion. We summarily reject the other remaining issues which require no additional analysis or relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987). We affirm the findings and the sentence.

*I. Background*

At the time of these offenses, Appellant was a judge advocate assigned to the utility law field support center at Tyndall Air Force Base (AFB), Florida. He had served as a judge advocate since 1997, including a prior tour as a trial defense counsel.

In April 2011, the National Center for Missing and Exploited Children notified the Air Force Office of Special Investigations (AFOSI) of a child sexual abuse allegation involving Appellant. One of Appellant's former "little brothers" in the Big Brothers Big Sisters (BBBS) program, now age 27, was alleging Appellant had sexually molested him between 1993 and 1997, prior to Appellant joining the Air Force.

AFOSI investigated and discovered Appellant had served in BBBS for nearly 20 years, mentoring five "little brothers" in various states. AFOSI also learned Appellant had been paired with a child in Florida in October 2010, but BBBS had dropped Appellant from the program in February 2011 for violating various BBBS policies, including unauthorized visits with the child. A representative from BBBS also told AFOSI that Appellant had flown two former "little brothers" to Florida during the holiday season in 2010.

Over the ensuing months, AFOSI's investigation (including physical surveillance of Appellant) led agents to suspect Appellant may have committed misconduct toward other boys. Therefore, in August 2011 agents received permission from the AFOSI region commander to place a GPS tracking device on Appellant's car, as detailed more fully in

---

[2] At that time, the panel consisted of Chief Judge Mitchell, Senior Judge Hecker, and Judge Weber. The Judge Advocate General designated Colonel Mitchell as the Chief Judge when Colonel Allred is conflicted from reviewing a case.

[3] By this time, Judge Weber was no longer assigned to the court. The panel consisted of Chief Judge Mitchell, Senior Judge Hecker, and Senior Judge Teller.

the discussion below. Using information from this device, AFOSI learned Appellant had signed a 17-year-old boy, AP, onto Tyndall AFB numerous times. Appellant lived on Tyndall AFB. AFOSI received AP's parents' permission to interview the boy, who stated he and Appellant had developed a sexual relationship after the two met online. AP also stated he and Appellant communicated online as the relationship developed. Within weeks, however, AP recanted his statement concerning his sexual relationship with Appellant, though he did not deny other aspects of the relationship.

At this time, AFOSI was coordinating with local sheriff's office who assumed a primary role in investigating the allegations involving AP while AFOSI investigated other aspects of the case. Because Appellant lived on base, however, AFOSI used the information from AP's statement to obtain a military magistrate's authorization to search Appellant's residence and person and seize items used to electronically communicate with AP. AFOSI seized a number of electronic devices from Appellant's home. In coordination with AFOSI, local sheriffs arrested Appellant the day after the search and seized other electronic devices Appellant had in his possession.

An analysis of Appellant's computer hard drives revealed thousands of images of child pornography depicting adult males engaging in sexual acts with boys. AFOSI also uncovered images of a male sexually molesting the younger sibling of a "little brother" Appellant sponsored years earlier. The adult male's face was not visible in the images, but other aspects of the images indicated Appellant was the person with the child in the images. Appellant was charged with committing indecent acts with the approximately 7 year old sibling. He was convicted of this offense, as well as violating a no-contact order by communicating with the child. Appellant was also convicted of violating the no-contact order by communicating with another child who had been assigned to him as a little brother.

Early in the AFOSI investigation, Appellant's commander issued Appellant a no-contact order regarding BBBS and other mentoring programs. A series of extensions and clarifications followed, and, in November 2011, Appellant's commander issued him a supplemental no-contact order concerning communication with AP. In March 2012, despite the no-contact orders, AFOSI agents discovered Appellant transporting AP in Appellant's car. The agents attempted to stop Appellant, but he drove away at an accelerated rate. After a brief pursuit, Appellant stopped. Appellant was promptly placed into pretrial confinement, where he remained until trial. Appellant was convicted of violating the no-contact order for communicating and being in the presence of AP.

AFOSI obtained additional search authorization for Appellant's home, car, and office. In a series of searches, agents seized, among other items, an external hard drive which contained a number of additional images of child pornography. The images from this hard drive formed the basis for the one specification of possessing child pornography of which Appellant was ultimately convicted, as well as the indecent act specifications. The numerous images of child pornography found during earlier searches were not

included in this specification, though the Government did admit them at trial under Mil. R. Evid 404(b). Additional facts relevant to each issue are detailed below.

## II. Issues I, XXIX, and XXXI—Search and Seizure Issues

At trial and again on appeal, Appellant alleged the Government violated his Fourth Amendment rights during the investigation in five distinct ways: (1) AFOSI placed a GPS tracking device on his car without a search warrant or authorization; (2) the military magistrate issued a search authorization that was overbroad in describing the items to be seized; (3) AFOSI conducted a warrantless search of Appellant's hard drives; (4) investigators exceeded the scope of the search authorization by searching for photos and videos on Appellant's hard drives; and (5) probable cause no longer existed at the time investigators searched the hard drives because by that point AP had recanted his allegation of a sexual relationship with Appellant. In a *Grostefon* assignment of error, Appellant re-raised these same issues, adding his own arguments and citations in support of his position.

We address each aspect of this assignment of error in turn. Having considered all matters submitted in support of this issue, (including Appellant's *Grostefon* submission) plus oral argument, we ultimately find investigators' actions in this case do not warrant suppression of any evidence against Appellant. In so holding, we note that certain aspects of investigators' actions in this case are hardly model investigative practices, but we find the searches and seizures in this case comport with the constitutional requirement of reasonableness.

### A. Warrantless Use of GPS Tracking Device

In June 2011, AFOSI began physical surveillance of Appellant but could not track Appellant continuously due to manpower limitations. Therefore, in August 2011, the local AFOSI detachment sought approval from its region commander to place a GPS device on Appellant's car which would allow AFOSI to track its movements by recording and transmitting the vehicle's locational coordinates. Following existing AFOSI guidelines, investigators did not seek a search warrant or create an affidavit. The request to the region commander stated the monitoring was needed to "determine the locations SUBJECT frequents" and asserted that the "investigative activity [was] essential to determine if other possible victims exist[ed]." The request asserted that "[the local AFOSI detachment did] not have the manpower available to track SUBJECT's movements on a daily basis." It also stated that "[t]he tracker [would] be used to determine if SUBJECT visits any children's organizations, parks, sports complexes, etc. where he could potentially have access to children."

Upon receiving the region commander's approval for 60 days of electronic surveillance, AFOSI attached the GPS device to the underside of Appellant's car on 23 August 2011 while the car was parked on base. The device remained on the car until 12 October 2011. Toward the end of this period, AFOSI used the GPS data to determine

Appellant was making frequent stops at the Tyndall AFB visitors' center at odd hours. AFOSI then reviewed the center's sign-in sheets and learned Appellant was signing 17-year-old AP onto the base. AFOSI previously had no knowledge of AP and his connection to Appellant. Two AFOSI agents who testified in motions practice both clearly indicated that the GPS data—not any other information gained during the investigation—led them to check the visitors' center records.

After learning this information from AFOSI, detectives from the local sheriff's office interviewed AP on 9 November 2011. AP related he and Appellant had met online and began engaging in sexually explicit conversations. Within several months, their relationship became sexual and the two engaged in sexual acts on at least 25 occasions starting in early May 2011, with the encounters taking place in Appellant's on-base home. AP recanted his allegation of sexual activity shortly thereafter, but he did not deny that he and Appellant met frequently at Appellant's home. That same day, AFOSI sought and received authorization from a military magistrate to search Appellant's on-base residence for certain electronic media, based, in part, on AP's statements that he met and engaged in sexually explicit conversations with Appellant online.

AFOSI continued its investigative activity and, in January 2012, it again placed a GPS tracking device on Appellant's car after receiving the region commander's permission. Within several days, the Supreme Court issued a decision holding that the installation of a GPS tracking device on a vehicle constitutes a search for Fourth Amendment purposes. AFOSI headquarters promptly issued guidance to cease use of these devices in the absence of a search warrant or authorization. In response, the AFOSI detachment removed the device from Appellant's vehicle and did not review the data obtained from it. Appellant does not allege any prejudicial error resulted from the second use of the GPS tracking device; only the first use of the device between August and October 2011 is at issue in this appeal.

In that Supreme Court decision, *Jones v. United States*, 132 S.Ct. 945 (2012), the Court analyzed whether the installation and month-long monitoring of a GPS device on the defendant's car constituted a search under the Fourth Amendment.[4] All nine Justices agreed that the defendant was searched when the police attached a GPS device to the underside of his car and tracked his movements for a month. *Id.* at 949. The Court split, however, on what constituted the "search." The majority held that the Government's attachment of the device, when coupled with an attempt to obtain information, constitutes a "search" under the Fourth Amendment. *Id.* Utilizing the common-law trespassory test, the Court found the government invaded the defendant's "effects" (vehicle) when it physically intruded on the defendant's private property to install the device for the purpose of obtaining information, a property rights intrusion that would have been considered a search within the meaning of the Fourth Amendment when it was adopted. *Id.* at 949, 954.

---

[4] The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend IV.

In reaching this conclusion, the *Jones* majority did not rely on the reasonable expectation of privacy test that had been exclusively used to analyze Fourth Amendment issues for almost 50 years, as the majority concluded the common law trespass-based approach disposed of the issue.[5] The four concurring justices would have utilized the expectation of privacy test and found a violation due to the long term (four week) tracking of the defendant, even when the tracking occurred on public streets.[6]

Relying on *Jones*, Appellant moved to suppress the GPS-derived evidence discovered through the use of the GPS data, including information derived from all media eventually found on Appellant's electronic devices and the interviews of AP. During that litigation, the Government conceded its placement and use of the GPS was a search within the meaning of the Fourth Amendment based on *Jones*, and the military judge agreed. The military judge, however, did not suppress any of the evidence, after finding applicable several exceptions to the exclusionary rule.

The Government ultimately did not offer the GPS evidence into evidence. Also, Appellant was not charged with sexually abusing AP, and thus the sexually oriented information provided by AP during his interviews was never admitted into evidence, though AP did testify regarding his contact with Appellant after he was issued the no-contact order. Appellant was convicted of possession of child pornography based on evidence found on one of the seized computer items. This evidence included some images of Appellant molesting the younger sibling of a "little brother" he sponsored years earlier, which served as the evidence for the indecent acts charge. Appellant argues that all this evidence stemmed from the Government's improper use of the GPS device between April and October 2011.

The Fourth Amendment protects against unreasonable searches and seizures. *United States v. Long*, 64 M.J. 57, 61 (C.A.A.F. 2006). The exclusionary rule is a judicially created remedy for violations of the Fourth Amendment and applies to evidence directly obtained through such a violation as well as evidence that is the indirect product (fruit) of unlawful police activity. *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014).

---

[5] The D.C. Circuit Court of Appeals had reversed the defendant's conviction, concluding the extended surveillance of the defendant's vehicle during a 28-day period constituted a warrantless search that was prohibited by the Fourth Amendment because (1) the use of the GPS was a search that violated the defendant's reasonable expectation of privacy in his movements over the month's long use of the GPS, (2) the search was not reasonable nonetheless, and (3) the improper admission of the GPS-derived data was not harmless. *United States v. Maynard*, 615 F.3d 544, 555–68 (D.C. Cir. 2010). The Supreme Court unanimously agreed the court of appeals' decision should be affirmed but the five justice majority opinion instead relied on trespass grounds, not expectation of privacy. *Jones v. United States*, 132 S.Ct. 945, 949–50 (2012). The Court also noted the government had waived its argument that its GPS monitoring was justified by its alleged reasonable suspicious or probable cause to believe Jones was involved in drug distribution when it failed to raise this issue in the lower court. *Id.* at 954. A four justice concurring opinion followed the approach of the lower court, applying the "reasonable expectation of privacy" test and concluding four weeks of continuous GPS monitoring constituted a search under that standard. *Id.* at 964.

[6] Justice Sotomayer, in a separate concurrence, agreed with both decisions. *Id.* at 957.

The exclusionary rule is a prudential doctrine fashioned to "compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011). It is not a personal constitutional right nor is it designed to redress an injury from an unconstitutional search. *Stone v. Powell*, 428 U.S. 465, 486 (1976). "The [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations. *Davis,* 564 U.S. at 236–37. Thus, in the absence of "appreciable deterrence," exclusion of evidence is "clearly . . . unwarranted." *Id.* at 237 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).

The exclusion of evidence "exacts a heavy toll on both the judicial system and society at large," because "[i]t almost always requires courts to ignore reliable, trustworthy evidence." *Davis*, 564 U.S. at 237. An "'unbending application'" of the exclusionary rule "would impede unacceptably the truth-finding functions of judge and jury" and "'[generate] disrespect for the law and administration of justice.'" *United States v. Leon*, 468 U.S. 897, 907–08 (1984) (quoting *Stone*, 428 U.S. at 491) (alteration in original). Because of these competing interests, the exclusionary rule calls for a "balancing approach," which requires weighing the deterrent effect of suppression against the costs of exclusion. *Id.* at 913–24. To warrant exclusion of evidence, the "deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237; *see also Stone*, 428 U.S. at 486–87. The cost of excluding evidence is often high and disproportionate to its deterrent effect "when law enforcement officers have acted in objective good faith or their transgressions have been minor." *Leon*, 468 U.S. at 908. "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." *Id.* at 919.

Here, the military judge found the exclusionary rule should not apply for three reasons. First, he concluded the good faith exception to that rule applied because AFOSI acted in objectively reasonable reliance on binding judicial precedent. Second, he found the evidence would inevitably have been discovered through lawful means. Third, he concluded the nexus between the Government's illegal conduct and the evidence was so weak that the taint of the illegality was dissipated.

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion, viewing the evidence in the light most favorable to the party prevailing below. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015). That means we review the military judge's findings of fact for clear error but his conclusions of law de novo. *Id*.

*1. Good Faith Exception*

Evidence obtained by way of a Fourth Amendment violation will not be excluded if "law enforcement officials reasonably believed in good faith that their conduct was in accordance with the law even if decisions subsequent to the search or seizure have held that conduct of the type engaged in by the law enforcement officials is not permitted by the Constitution." *United States v. Peltier*, 422 U.S. 531, 538 (1975). This reflects the

Supreme Court's determination that the slight deterrent benefit of excluding evidence derived from searches that were proper when conducted but held to be invalid in light of later case law does not justify the injury to society when criminal acts go unpunished. *Davis*, 564 U.S. at 239. The "harsh sanction of exclusion" is triggered only when law enforcement actions "are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)) (alteration in original). The "rigorous weighing" of the cost-benefit analysis requires a focus on the "flagrancy of the police misconduct" at issue, and when law enforcement agents act "with an objectively reasonable good-faith belief that their conduct is lawful," the deterrent value of suppression is diminished. *Id.* at 238 (citing *United States v. Leon*, 468 U.S. 897, 909, 919 (1984)). Suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919.

In *Davis*, the Supreme Court extended this good faith exception to situations where law enforcement agents act in objectively reasonable reliance on binding judicial decisions affecting their conduct even though that conduct is subsequently deemed unconstitutional; in such circumstances, the agents' culpability is wholly absent. *Davis*, 564 U.S. 229, 239–40.[7] To exclude evidence when law enforcement rely on binding judicial precedent would only deter conscientious police work. *Id.* at 241. Officers who act in "strict compliance with binding precedent" do not violate the defendant's Fourth Amendment rights "deliberately, recklessly, or with gross negligence" and such a situation does not involve any "recurring or systematic negligence" by law enforcement warranting exclusion. *Id.* at 240.

In the wake of *Jones*, federal circuit courts have regularly applied *Davis* to the question of how to handle law enforcement uses of GPS tracking devices that seemed lawful at the time but later proved to be Fourth Amendment violations based on the *Jones* decision. In circuits where precedent had directly addressed the propriety of warrantless use of GPS devices prior to *Jones*, these post-*Jones* decisions universally held that such use did not require application of the exclusionary rule since the investigators were acting in objectively reasonable reliance on that binding precedent. *See, e.g., United States v. Andres*, 703 F.3d 828, 835 (5th Cir. 2013); *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012); *United States v. Ransfer*, 743 F.3d 766, 774 (11th Cir. 2014).

---

[7] In *Davis*, officers searched the defendant's car after arresting him and placing him in a police car. At the time of the officer's search, the Supreme Court had not yet decided *Arizona v. Gant*, 556 U.S. 332 (2009), which held that the Fourth Amendment requires officers to demonstrate the arrestee posed a continuing threat to their safety or a need to preserve evidence related to the crime to justify a warrantless vehicular search incident to arrest. *Id.* 556 U.S. at 341–48. Prior to *Gant*, the Court of Appeals for the Eleventh Circuit had interpreted the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment simply incident to a recent occupant's arrest. The Supreme Court found the officers' conduct in *Davis* "was in strict compliance with then-binding Circuit law and was not culpable in any way," but that the conduct was unconstitutional under *Gant*. *Davis v. United States*, 564 U.S. 229, 239–40 (2011).

To date, neither the Court of Appeals for the Armed Forces nor any service court has issued any decisions regarding the government's installation and subsequent monitoring of a GPS device. Similarly situated federal courts have, however, found the Supreme Court's pre-*Jones* decisions in *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984), to constitute the binding appellate precedent upon which law enforcement could reasonably have relied. *See, e.g., United States v. Baez*, 744 F.3d 30, 35 (1st Cir. 2014); *United States v. Aguiar*, 737 F.3d 251, 261 (2nd Cir. 2013), *cert. denied*, 135 S.Ct. 400 (2014); *United States v. Katzin*, 769 F.3d 163, 173–74 (3rd Cir. 2014) (en banc); *United States v. Stephens*, 764 F.3d 327, 337 (4th Cir. 2014); *United States v. Fisher*, 745 F.3d 200, 204 (6th Cir. 2014), *cert. denied*, 135 S.Ct. 676 (2014); *United States v. Brown*, 744 F.3d 474, 477–78 (7th Cir. 2014); *United States v. Robinson*, 781 F.3d 453, 459 (8th Cir. 2015), *cert. denied,* 136 S.Ct. 596; *United States v. Hohn*, 606 Fed. Appx. 902, 906 (10th Cir. 2015) (unpub. op.).[8]

We follow this approach here and find that, at the time the AFOSI agents employed the GPS device without first procuring a warrant or search authorization, they acted in objectively reasonable reliance on the holdings of these two Supreme Court decisions to provide authority for their actions.[9] Those decisions considered whether the Fourth Amendment required a warrant for the government to monitor a suspect's location using a government-installed radio transmitter (beeper), and utilized the reasonable expectation of

---

[8] FED. R. CRIM. P. 41 governs the issuance of a warrant in a federal criminal proceeding. The 2006 Advisory Committee's Note to this rule cited *United States v. Knotts,* 460 U.S. 276 (1983), and *United States v. Karo,* 468 U.S. 705 (1984), for the proposition that, under the *Katz* test, warrantless GPS tracking is lawful except in areas reasonably considered private, stating, "Warrants may be required to monitor tracking devices when they are used to monitor persons or property *in areas where there is a reasonable expectation of privacy.*" Fed. R. Crim. P. 41(b) advisory committee's note (2006) (citing *Karo,* 468 U.S. 705) (emphasis added). "[I]f the officers intend to install or use the device in a constitutionally protected area, they must obtain judicial approval to do so." *Id.* It also stated, "If, on the other hand, the officers intend to install and use the device without implicating any Fourth Amendment rights, *there is no need to obtain the warrant.*" *Id.* (citing *Knotts,* 460 U.S. 276) (emphasis added).

[9] When considering how constitutional rights apply to servicemembers, military appellate courts are bound by the precedent of the Supreme Court unless by text or scope they are plainly inapplicable. *United States v. Marcum*, 60 M.J. 198, 205 (C.A.A.F. 2004). Our superior court has consistently applied the Bill of Rights to members of the Armed Forces except in cases where the express terms of the Constitution make such application inapposite. *Id.* "At the same time, these constitutional rights may apply differently to members of the armed forces than they do to civilians" given that the military is a specialized society. *Id.* When considering how the Fourth Amendment applies in the military context, we rely on Supreme Court precedent but we also specifically consider whether any contextual factors involving military life require a deviation from that precedent. *Id.* at 205–06 (citing *United States v. McCarthy*, 38 M.J. 398 (C.M.A. 1993) (warrantless entry into military barracks room to effectuate apprehension did not violate Fourth Amendment)); *see also United States v. Taylor*, 41 M.J. 168, 170 (C.M.A. 1994) (noting that Military Rules of Evidence 311 through 317, "like the decisions of the Supreme Court, divide Fourth Amendment issues between coverage (that is, when the Fourth Amendment is applicable) and protections").

privacy test first formulated in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring),[10] and used by the concurring justices in *Jones*.[11]

In *United States v. Knotts*, 460 U.S. 276 (1983), the Court found the warrantless use of a tracking device to monitor the movements of a vehicle on public roads did not violate the Fourth Amendment.[12] The Court explained that, under the *Katz* framework, the determination of whether a governmental intrusion constitutes a search under the Fourth Amendment "cannot turn upon the presence or absence of a physical intrusion into any given enclosure," but instead depends on whether the intrusion invaded a suspect's reasonable expectation of privacy. *Id.* at 280–81. Applying that framework, the Court concluded that the use of a beeper to track the location of a suspect's car on public roads did not constitute a search under the Fourth Amendment because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 277, 281. "The fact that the officers . . . relied not only on visual surveillance, but on the use of the beeper . . . does not alter the situation" relative to the Fourth Amendment. *Id.* at 282; *see also* Mil. R. Evid. 311(a) (Evidence obtained through an unreasonable search is inadmissible if "[t]he accused had a reasonable expectation of privacy in the . . . property searched . . . or the accused would otherwise have grounds to object . . . under the Constitution . . . as applied to members of the armed forces."); *Manual for Courts-Martial, United States,* Analysis of the Military Rules of Evidence, A22-17 (2012 ed.) (Military "Rules [of Evidence] 311–317 express the manner in which the Fourth Amendment to the Constitution … applies to trials by courts-martial.").

The following year, in *United States v. Karo*, 468 U.S. 705 (1984), the Supreme Court reaffirmed the privacy framework by discounting the importance of trespass in the placement of the beeper device, finding "[t]he existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated . . . [as] an actual trespass is neither necessary nor sufficient to establish a constitutional violation." *Id.* at 712–13. The Court then found a Fourth Amendment violation when the government used a beeper to monitor the location of a container by having it carried inside the defendant's residence, as, unlike the situation in *Knotts*, the presence of the beeper

---

[10] In *Katz*, the Supreme Court held an electronic surveillance of the petitioner's conversations while he was in a public telephone booth was impermissible, despite his lack of property interest in the location. *Katz v. United States*, 389 U.S. 347, 359 (1967). This reversed prior precedent which interpreted the Fourth Amendment very narrowly in holding that only physical searches of "material things—the person, the house, his papers or his effects" were implicated by the Fourth Amendment. *Olmstead v. United States*, 277 U.S. 438, 464 (1928). In contrast, *Katz* held "the Fourth Amendment protects people, not places." 389 U.S. at 351. In the *Jones* decision, the majority announced that the *Katz* privacy test added to, but did not replace, the prior common law trespass-based one. *United States v. Jones*, 132 S.Ct. 945, 952 (2012).

[11] The majority decision in *Jones* did not overrule *Knotts* or *Karo*, noting that the expectation of privacy test used in those cases had "been *added to*, not *substituted for*, the common-law trespassory test." *Jones,* 132 S.Ct. at 952.

[12] This case has been considered the "foundational Supreme Court precedent for GPS-related cases." *United States v. Cuevas-Perez*, 640 F.3d 272, 273 (7th Cir. 2011).

inside a can of contraband "could not have been visually verified" by officers unless they entered the home. *Id.* at 715.

Our superior court consistently applied the reasonable expectation of privacy approach to searches conducted by military investigators, as opposed to the principles of property law and trespass. *See, e.g., United States v. Long*, 64 M.J. 57, 70 (C.A.A.F. 2006) ("[T]he Supreme Court's expectation of privacy approach applies [and] the possibility of exposure to the public eye diminishes or alleviates one's expectation of privacy . . . ."); *United States v. Daniels*, 60 M.J. 69, 71 (C.A.A.F. 2004) (noting "[t]he United States Supreme Court defines a Fourth Amendment 'search' as a government intrusion into an individual's reasonable expectation of privacy" and analyzing the issue under that framework); *United States v. Springer*, 58 M.J. 164, 168 (C.A.A.F. 2003) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."); *United States v. Wisniewski*, 21 M.J. 370, 372 (C.M.A. 1986) (holding barracks resident had no reasonable expectation of privacy from visual intrusions where the contents of his room could be plainly viewed from a public walkway).

Although not ruling directly on the constitutionality of warrantless tracking technology for vehicles, our superior court has referenced the limited expectations of privacy in the movements of automobiles. In *United States v. Baker*, 30 M.J. 262, 267 (C.M.A. 1990), the court referenced *Knotts* for the proposition that "[t]here is no expectation of privacy in the movement of a car on a highway, so that the warrantless use of a beeper to trace the car does not violate the Fourth Amendment." *See also United States v. Hessler*, 4 M.J. 303, 314–15 (C.M.A. 1978) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . . It travels public thoroughfares where both its occupants and its contents are in plain view.") (quoting *United States v. Chadwick*, 433 U.S. 1, 12 (1977)) (alteration in original).

Thus, while no binding appellate precedent existed in the military appellate courts that definitively stated AFOSI's actions were lawful, none was needed because the Supreme Court and our superior court had made clear that Fourth Amendment issues in the military are analyzed with regard to the accused's reasonable expectation of privacy. This area of the law appeared settled prior to *Jones*. In light of this case law involving similar technology, it was reasonable for the AFOSI policy to not require a warrant or search authorization prior to the installation of a tracking device on a suspect's vehicle while it was parked in a public place, and subsequent monitoring of the vehicle's movements on public roads. The relevant Supreme Court and Court of Appeals for the Armed Forces case law at that time indicated no Fourth Amendment search occurred due to the suspect's lack of a reasonable expectation of privacy in the areas accessed by the agents and in the locations of the car on public roads. AFOSI could reasonably conclude placing the GPS tracking device on Appellant's vehicle did not violate the Fourth Amendment and thus did not require a warrant or search authorization.

Appellant also argues that even if relevant appellate precedent supports the warrantless use of a GPS tracking device, the Government presented no evidence that agents working on Appellant's case were actually aware of and relied on such precedent. *Davis* does not indicate such evidence is necessary, and neither do any of the post-*Jones* circuit cases applying *Davis*. *See, e.g., United States v. Martin*, 807 F.3d 842, 847 (7th Cir. 2015); *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014). "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved." *Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). We, likewise, decline to impose a subjective requirement. The agents' subjective knowledge or awareness is irrelevant, unless their conduct is sufficiently culpable and deliberate to trigger the invocation of the exclusionary rule. *Herring*, 555 U.S. at 143–45. Evaluating Fourth Amendment issues based solely on subjective good faith would improperly leave its protections in the discretion of the police. *Leon*, 468 U.S. at 915 n.13. It would also invite "federal courts on an expedition into the minds of police officers," a foray that "would produce a grave and fruitless misallocation of judicial resources." *Id.* at 922 n.23 (quoting *Massachusetts v. Painten*, 389 U.S. 560 565 (1968)). We thus seek to determine the "objectively ascertainable question" of "whether a reasonably well trained officer would have known that the search was illegal in light" of binding relevant precedent, as "[t]he pertinent analysis of deterrence and culpability is objective." *Herring*, 555 U.S. at 145. Here, we find a reasonably well trained AFOSI agent in 2011 would have known that Supreme Court precedent permitted him to attach a GPS device to Appellant's car in a public location and monitor its movements without seeking a warrant. It is objectively apparent that the AFOSI policy was developed in light of the then-current state of the law regarding whether monitoring the location of a vehicle on public roads involved a Fourth Amendment search. No evidence of actual knowledge of or reliance on specific cases is necessary.

In sum, the agents in this case could reasonably have relied on the Supreme Court's holdings in *Knotts* and *Karo* and our Superior Court's expectation of privacy framework to conclude that their warrantless placement of the GPS device and their use of the device to monitor the movements of Appellant's vehicle on public streets and highways did not violate the Fourth Amendment. Such a search, conducted in objectively reasonable reliance on binding appellate precedent, is not subject to the exclusionary rule. Thus, the military judge did not abuse his discretion in declining to suppress the contested evidence.

### 2. Inevitable Discovery

Even in the absence of the good faith exception, the evidence derived from the GPS device would have been admissible because it would have inevitably been discovered by law enforcement, even in the absence of the GPS data.

Improperly obtained evidence is admissible if it inevitably would have been discovered through independent, lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Wallace*, 66 M.J. 5, 10 (C.A.A.F. 2008). Mil. R. Evid. 311(b)(2) covers this exception to the exclusionary rule and states "[e]vidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." The "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix*, 467 U.S. at 446. The purpose of this doctrine is to ensure the exclusionary rule does not "put the police in a worse position than they would have been in absent any error or violation." *Id.* at 443.

For the inevitable discovery doctrine to apply, the prosecution must establish, by a preponderance of the evidence, that "when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred." *United States v. Dease,* 71 M.J. 116, 122 (C.A.A.F. 2012) (quoting *United States v. Kozak*, 12 M.J. 389, 394 (C.M.A. 1982)). "'[M]ere speculation and conjecture' as to the inevitable discovery of the evidence is not sufficient when applying this exception." *Wicks*, 73 M.J. at 103 (quoting *United States v. Maxwell*, 45 M.J. 406, 422 (C.A.A.F. 1996)) (alteration in original). The prosecution must prove, based on demonstrated historical facts, that the evidence would have been discovered even if the illegal search had not occurred, through an alternative means untainted by the illegality. *Nix*, 467 U.S. at 443 n.5. This exception is only applicable "[w]hen the routine procedures of a law enforcement agency would inevitably find the same evidence." *Wicks*, 73 M.J. at 103 (quoting *United States v. Owens*, 51 M.J. 204, 204 (C.A.A.F. 1999)) (alteration in original).

We review a military judge's inevitable discovery rulings for an abuse of discretion. *Dease*, 71 M.J. at 121. In this context, our superior court has applied a distinctly deferential standard of review. "In order to find an abuse of discretion, we must find that the military judge committed a clear error in his conclusions." *Id.* (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)).

Before the GPS was installed, AFOSI's investigation had been focused on Appellant's involvement with BBBS and his potentially inappropriate relationship with boys he met through that program. Agents had interviewed JP about his relationship with Appellant, which included sexual contact at Appellant's residence and activities consistent with sexual offender grooming behavior. Agents had also found and interviewed several of Appellant's former little brothers or their parents in multiple states and had learned Appellant often flew and drove his little brothers to meet him or spend overnights with him at various locations, including his home, and communicated with them over social media, email or text messaging. His 20-year relationship with the BBBS had recently been terminated by the organization due to his repeated violations of the BBBS visitation

policies with his latest little brother, including taking the child for the Christmas 2010 holidays without permission. Appellant's response to being terminated was to ask if he was being "accused of something." After the termination, Appellant continued contact with that child through social media.

According to the testimony of an AFOSI agent during the litigation of this motion, agents had also engaged in an unspecified amount of physical surveillance of Appellant, beginning in June or July 2011. They also found a pamphlet from a local high school band in his trash around this same timeframe. Agents had also conducted checks with several dozen youth organizations in Florida and learned Appellant had never been a volunteer with their programs. Appellant's neighbors were also interviewed (including a boy who Appellant assisted with baseball), but they had no information about the matters being investigated.

The military judge reached certain conclusions in ruling on the Defense motion. He found AFOSI considered this case of alleged sexual molestation by a field grade officer to be very serious, and the agents were committed to monitoring Appellant's activities, whereabouts, and patterns. Before placing the GPS tracker, AFOSI possessed information suggesting Appellant had a long term and ongoing history of inappropriate relations with underage males, which included meeting them at his civilian and military residences. AFOSI was aggressively seeking to discover whether Appellant had any contacts with male youth in and around the base. Based on this, the military judge concluded the Government would inevitably have discovered the association between Appellant and AP since the two were meeting on a regular basis and engaging in sexual encounters at Appellant's on-base residence during the active investigation. AP's girlfriend and others had noticed and began to ask AP about their relationship. The military judge concluded that the fact that Appellant was picking AP up after school, dropping him off at his home, meeting him at the base visitor center, and obtaining visitor passes to bring him onto base could hardly have escaped AFOSI's attention for long. He was certain that, under these circumstances, investigators would eventually have discovered an association between Appellant and AP and would have questioned AP about that relationship, thus AP's statement to law enforcement was admissible.

We find the military judge did not abuse his discretion in finding that law enforcement would inevitably have discovered an association between Appellant and AP and would have questioned AP about it. The Government met its burden of demonstrating it was more likely than not that, as of the day the GPS was installed, the agents were actively pursuing leads that would have inevitably led them to discover AP. As of that time, AFOSI knew a former little brother had made serious sexual abuse allegations against Appellant and that Appellant had recently been terminated from his long-term involvement with the BBBS program based on his recent efforts to engage in unauthorized visits with his little brother. The investigation had also revealed that, within the past six months, Appellant had brought former little brothers from other states in order to spend the holidays

with him in Florida. Agents also were actively pursuing leads to determine whether Appellant had any contacts with other boys in the local area. Indicia of an interaction with a high school band was found in Appellant' trash (AP was a member of that band). Agents were aware Appellant had a history of meeting boys at his residence (including his most recent little brother), and the agents had engaged in some physical surveillance of that residence. We also note that the government was already in possession of the visitor's center sign-in sheets, as they were maintained at the Tyndall AFB visitor's center.

In light of this evidence and these leads, it is more likely than not that the existence of AP would inevitably have been discovered by AFOSI through its ongoing investigation and surveillance efforts, given that Appellant was bringing AP onto base on a regular basis, often after signing him onto base through the visitor center. The military judge did not abuse his discretion in declining to suppress the evidence.

### 3. Attenuation

Under the fruit of the poisonous tree doctrine, the exclusionary rule prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the direct evidence found in the search or that has been acquired from it, "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Attenuation can occur "when the causal connection [between the search and the evidence] is remote. Attenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (citation omitted). The attenuation doctrine applies to a witness's testimony at trial where the identity of the witness was discovered during an unlawful search. *United States v. Ceccolini*, 435 U.S. 268, 280 (1978). Such testimony may be admitted even when the witness's identity was discovered through an unconstitutional search. *Leon* 468 U.S. at 910 (citing *Ceccolini*, 435 U.S. 268). "[S]ince the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Ceccolini*, 435 U.S. at 278.

There is no bright line rule to determine whether derivative evidence is sufficiently attenuated to be admissible. *United States v. Mapes*, 59 M.J. 60, 78 (C.A.A.F. 2003). Instead, we examine several factors in determining whether to exclude evidence of live-witness testimony derived from illegal police activity. *United States v. Jones*, 64 M.J. 596, 603 (Army Ct. Crim. App. 1997).[13] First, we consider the degree of free will exercised by the witness because "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he . . . will be discovered by legal means and, concomitantly, the smaller

---

[13] At trial, the military judge applied the factors set forth in *United States v. Conklin*, 63 M.J. 333, 338–39 (C.A.A.F. 2006), a case evaluating whether an accused's consent to a subsequent search dissipated the taint of an earlier illegal search. The *Conklin* factors are related to, but not identical to, those used in evaluating the admissibility of live witness testimony.

the incentive to conduct an illegal search to discover the witness." *Id.* (quoting *Ceccolini*, 435 U.S. at 276) (alteration in original). Second, we consider the time lapse "between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other." *Id.* (quoting *Ceccolini*, 435 U.S. at 279). Third, we consider the role of the original illegal law enforcement activity in procuring the witness's testimony, the law enforcement's purpose, and the flagrancy of that conduct. *Id.* (citing *Ceccolini*, 435 U.S. at 279). Lastly, we conduct a cost-benefit analysis by comparing the cost of exclusion on the "evenhanded system of law enforcement" with the beneficial deterrent effect of exclusion. *Id.* (quoting *Ceccolini*, 435 U.S. at 280).

Here, we determine by a preponderance of the evidence that the Government met its burden. We find AP exercised his free will while making his initial statements, his partially recanting, and testifying at the court-martial. AP's testimony and earlier statements were the product of his voluntary acts and were not coerced or induced by official authority, and thus constitute an independent source. *See Ceccolini*, 435 U.S. at 279; *United States v. Fogg*, 52 M.J. 144, 151 (C.A.A.F. 1999) ("Certainly, there is an independent source in the testimony of the victims which, in this case, was the product of their voluntary acts."). As to the temporal proximity, the time lapse between the illegal use of the GPS device and the initial contact with AP was approximately 26 days, and AP testified at trial over a year later.[14] This factor, therefore, also favors the Government. The third factor is directed at police misconduct and whether such conduct has been employed to exploit the illegality. *United States v. Khamsouk*, 57 M.J. 282, 292 (C.A.A.F. 2002). As discussed above, we found the AFOSI acted in good faith when they gathered GPS data without a warrant or search authorization, and this factor favors the Government. Similarly, due to the lack of intentionally unlawful behavior by AFOSI, excluding the evidence would have a minimal deterrent effect, while the cost of excluding the contested evidence would be high. Furthermore, the information in the log-in sheets was already possessed by the government at Tyndall AFB's visitor's center. Given this, we find the evidence procured from AP and the search of Appellant's house is sufficiently attenuated to be admissible and we find the military judge did not abuse his discretion by denying the defense request to exclude that evidence.

Thus, the military judge did not abuse his discretion in declining to suppress the contested evidence.

## B. *Breadth of Search Authorization for Appellant's Hard Drives*

After visitor center records revealed Appellant was signing AP onto base at odd hours, AFOSI contacted the Bay County Sherriff's Office (BCSO) for assistance. BCSO detectives subsequently interviewed AP, who told them he had engaged in a sexual

---

[14] AP testified at trial over a year later but did not testify regarding the sexual contact he had with Appellant, as Appellant was not charged for that activity. Instead, AP testified about his non-sexual contact with Appellant after the issuance of the no-contact order.

relationship with Appellant. In addition, he indicated that he had communicated through electronic means with Appellant as that relationship developed, although he offered no specifics about the nature or extent of this communication.

Soon after the interview with AP, AFOSI contacted a judge advocate for legal advice concerning searches and seizures of Appellant's electronic media devices from his on-base residence.[15] After being advised that sufficient probable cause existed to examine those devices, AFOSI contacted a military magistrate and received verbal authorization to search them. Testimony from AFOSI agents at trial makes clear they were seeking authorization to "search" the devices, not just seize them. In addition, the affidavit accompanying the written search authorization requests permission to "search for and collect" the pertinent electronic media devices.

However, when this authorization was memorialized in writing the next day, the search authorization form did not specifically state that a search of the devices was being authorized. Instead, that form contains one line to list the "premises" to be searched, then contains more space to list the property subject to "seizure." It appears that this ambiguity in the form is what led AFOSI to list the electronic media as property to be "seized" while broadly listing the residence as subject to search. The form authorizes a *search* of Appellant's home, and *seizure* of the electronic media devices. Based on this, Appellant argues that AFOSI did not have authorization to search the electronic media devices after they were seized. We disagree.

Based on the facts above, we are satisfied that the clear intent of AFOSI was to request permission to "search" the electronic media devices, rather than merely to "seize" them. We are similarly convinced that the military magistrate's intent was the same. *See United States v. Carpenter,* ACM 38628 (A.F. Ct. Crim. App. 14 January 2016) (unpub. op.) (finding that although warrant only authorized seizure, intent of military magistrate was to authorize search of electronic devices, and at a minimum the good faith exception applied). The Fourth Amendment requires a warrant to particularly describe the "place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The search authorization in this case did exactly that: it described the particular address of the "place to be searched," and it particularly described the "persons or things to be seized." A search that is conducted pursuant to a search authorization is presumptively reasonable. *United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014). As discussed below, there are still restrictions on the scope of the authorization, but the authorization did cover the search of the media seized in the residence. The search authorization plainly intended to grant AFOSI permission to search the contents of the electronic media devices, and even if an error was committed in completing the form, at a minimum the good faith exception to the exclusionary rule applies. *See United States v. Carter*, 54 M.J. 414, 419 (C.A.A.F. 2001).

---

[15] At the time, AFOSI appears to have been acting in a supporting role to the Bay County Sherriff's Office, which was investigating Appellant for the state offense of using a computer to entice a minor to engage in sexual acts.

We therefore find the military judge did not abuse his discretion in declining to suppress the evidence on this basis.

*C. Terms of Search Authorization and Scope of Search*

The affidavit requesting search authorization for Appellant's residence stated AFOSI was investigating "Florida Statute Section 847.0135 Computer Pornography; Traveling to meet a minor." The AFOSI special agent who submitted the affidavit to the magistrate testified at trial that, at the time the affidavit was signed, AFOSI was solely focused on supporting BCSO in its investigation that Appellant used a computer to entice AP to engage in sexual acts. He testified AFOSI sought search authorization because they were investigating the crime of traveling to meet a minor, and that electronic media had been used to communicate with and entice the minor. The Florida state statute defines "traveling to meet a minor" as, inter alia, a person who travels within the state in order to engage in an illegal sexual act with a child under the age of 18 years after using a computer online or Internet service to seduce, solicit, lure or entice the child to do so. FLA. STAT. § 847.0135(3) (2010). Thus, when AFOSI sought the search authorization, it was looking for evidence that Appellant used any device capable of electronic data storage or transmission in order to seduce, solicit, lure, or entice AP to engage in an illegal sexual act with him. AFOSI was not necessarily looking for evidence that Appellant possessed any child pornography, and the record reveals no indication that he was suspected of such an offense at that time.

The military magistrate granted AFOSI's request for authorization to conduct a search of Appellant's residence to obtain "[a]ll electronic media and power cords for devices capable of transmitting or storing online communications." AFOSI's search of the residence resulted in the seizure of standalone computer hard drives, phones, thumb drives, floppy diskettes, and camera memory cards.

AFOSI then sent these items to a forensic laboratory which was tasked with searching them "for all video, images and possible online communications." The request expressly sought "any and all information saved or maintained on [Appellant's] cellular telephones, laptop computers or hard drives; all associated SIM cards, components, peripherals or other data, relating to the matter being investigated."

Based on this request, the laboratory prepared a forensic data extraction (FDE) of the applicable devices and returned the FDE to AFOSI for its review. An AFOSI agent plugged the FDE into a stand-alone laptop and reviewed the files contained in it. The FDE was organized by file type such as pictures, chat messages, and so forth, with sub-folders included within each main folder. The agent testified that he first searched through the "pictures" folder, because that was the folder at the top of the screen, finding several pictures of AP, videos of AP's band concerts, and a screenshot of a Skype session between Appellant and AP. Then, in one of the sub-folders, the agent discovered what appeared to

be child pornography. He stopped his review of the FDE until he obtained another search authorization to look for further evidence involving child pornography.

At trial and on appeal, Appellant asserts that the search authorization was unconstitutional because it was overbroad in defining what could be seized. Appellant contends the Government only had information that Appellant had engaged in "online communications" with AP. Instead of using vague terms such as "electronic media," he asserts the search authorization should have more particularly described types of electronics that could be used for such communications, such as laptop computers, smart phones, or gaming systems. Appellant also asserts that the manner in which AFOSI conducted the search and seizure reinforced the overbroad nature of the search authorization, as AFOSI indiscriminately seized multiple types of electronics that could not reasonably be expected to store such online communications. In a related aspect of this assignment of error, Appellant avers that even if the search authorization was not overbroad, AFOSI exceeded its scope by asking the forensic laboratory to search for videos and images, and then by first looking through the "pictures" folder rather than "chats," "internet history," or another folder that might more reasonably be expected to contain any evidence relevant to the online communications crime being investigated.

We first address Appellant's claim that the search authorization was unconstitutionally overbroad. In denying the defense's suppression motion, the military judge noted that AFOSI relayed the following information to the magistrate: Appellant had met AP online, he had engaged in sexually explicit conversations with AP for about a year, he had then involved AP in a sexual relationship, and Appellant had used his computer to entice AP onto Tyndall AFB. The military judge ruled that these details provided a substantial basis to search for the requested items, and the search authorization was not overbroad because it contained enough particularity to sufficiently guide and control the agents' judgment in selecting what to seize. *See,. United States v. Hoffman*, 75 M.J. 120, 128 (C.A.A.F. 2016) (the good-faith exception requires the individual issuing the authorization have a substantial basis for determining the existence of probable cause) We agree with the military judge's analysis.

The Fourth Amendment's requirement that a warrant particularly describe the scope of a search warrant prevents the government from engaging in "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The specific description of things to be seized and the place to be searched "eliminates the danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *United States v. Greene*, 250 F.3d 471, 476–77 (6th Cir. 2001) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991)). To meet this requirement, a "warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). Mil. R. Evid. 315(b)(1) echoes the Fourth Amendment's particularity requirement. We review de novo whether the search

authorization was overly broad, resulting in a general search prohibited by the Fourth Amendment. *United States v. Maxwell*, 45 M.J. 406, 420 (C.A.A.F. 1996).

In an early case evaluating the specificity of warrants relative to electronic transmissions and communications, our superior court held that a federal warrant authorizing a search of the accused's Internet service provider's computer bank was not overly broad. *United States v. Maxwell*, 45 M.J. 406 (C.A.A.F. 1996). In *Maxwell*, the court held that a warrant complied with the Fourth Amendment's particularity requirement even though it: (1) included names of those merely receiving obscenity and unknowingly receiving child pornography, as opposed to only those transmitting obscenity and knowingly receiving child pornography (the only illegal acts); and (2) lacked an identifiable "e-mail chain" to conclusively link the copies of the pornographic computer files presented to the magistrate with the separate typed list of user names provided as an attachment to the warrant application. *Id.* at 420. The court noted that the search authorization was drawn as narrowly as possible without conducting an "advance search" of recipients' mailboxes in order to weed out those who might have unknowingly received the illegal materials. *Id.* The court declined "to establish a more substantial burden . . . to impose unreasonably restrictive requirements for preparation of a search warrant." *Id.* at 421.

Our superior court's holding generally comports with precedent developed in the federal civilian courts in the area of particularity. The Tenth Circuit has taken an active role in this area. On the one hand, "[t]he modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important." *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). On the other hand, because computer evidence is easily mislabeled or disguised, "a computer search 'may be as extensive as reasonably required to locate the items described in the warrant.'" *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006) (quoting *United States v. Wuagneux,* 683 F.2d 1343, 1352 (11th Cir. 1982)). Therefore, "[i]t is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods—that process must remain dynamic." *United States v. Burgess*, 576 F.3d 1078, 1093 (10th Cir. 2009). "In summary, it is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives." *Id.* at 1094.

The Tenth Circuit has not been alone in recognizing that search warrants for evidence residing on computer devices may necessarily require somewhat broad terms to ensure investigators may locate evidence of a crime. For example, in *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999), the court held a warrant that authorized the search and seizure of "[a]ny and all visual depictions, in any format or media, of minors engaging in sexually explicit conduct [as defined by the statute]," was not

unconstitutionally overbroad. The court held that the search and seizure of all available disks was "about the narrowest definable search and seizure reasonably likely to obtain the images." *Id.* Likewise, in *United States v. Hall*, 142 F.3d 988, 996–97 (7th Cir. 1998), the court held that a broad warrant allowing the search and seizure of many types of electronic media storage devices for child pornography or child erotica satisfied the particularity requirement. The court noted that the items listed in the warrant were qualified by phrases that emphasized that these items were related to child pornography. *Id.* In *United States v. Richards*, 659 F.3d 527 (6th Cir. 2011), the court upheld a broad warrant to search a computer server, noting that the degree of specificity required varies with circumstances of each case. The Sixth Circuit recognized:

> [G]iven the unique problem encountered in computer searches, and the practical difficulties inherent in implementing universal search methodologies, the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis: "While officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant, . . . a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause."

*Id.* at 538 (quoting *Burgess*, 576 F.3d at 1092) (omission in original).

Likewise, courts have demonstrated a trend toward granting investigators latitude in the manner in which computer searches are conducted, while recognizing that there are limits to such authority. In 2008, this court found AFOSI exceeded the scope of a search authorization while investigating a sexual assault allegation. *United States v. Osorio*, 66 M.J. 632 (A.F. Ct. Crim. App. 2008). A warrant granted AFOSI permission to search the computer and memory card for photos taken on the night of the alleged sexual assault. *Id.* at 634. However, an AFOSI agent preparing a mirror image of the hard drive opened thumbnail images of what appeared to be nude people and discovered child pornography. *Id.* at 635. This court found the search warrant was limited in scope and did not allow AFOSI to search the computer for photographs taken on dates other than the date of the alleged sexual assault. *Id.* at 636. Thus, we found that AFOSI exceeded the scope of this narrow warrant. Unlike *Osorio,* we conclude that the scope of the warrant was not exceeded in this case.

While computer technology involves greater dangers of invasion of privacy and overreaching, computer searches are fundamentally no different than other searches involving commingled documents. When commingled records are searched, "it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andersen v.*

*Maryland*, 427 U.S. 463, 482 n.111 (1976). In these types of searches, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.* Investigators must be allowed a "brief perusal of documents in plain view in order to determine whether probable cause exists for their seizure under the warrant." *United States v. Heldt*, 668 F.2d 1238, 1267 (D.C. Cir. 1981). Because computers and other electronic devices with internal digital storage have the capacity to store tremendous amounts of intermingled data, there may not be a practical substitute for briefly examining many, if not all, of the contents. *United States v. Burgess,* 576 F.3d 1078, 1094 (10th Cir. 2009); *United States v. Richards*, 659 F.3d 527, 539–40 (6th Cir. 2011)."The general touchstone of reasonableness which governs Fourth Amendment analysis . . . governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

Based on these legal principles, we find no constitutional overbreadth concern with either the terms of the search authorization or the manner in which the search was carried out. As to the terms of the authorization, the military magistrate used the available information to define the scope of the search authorization. At the time it sought the search authorization, AFOSI was primarily relying on AP's statement that he and Appellant had engaged in protracted sexual communications online. AP was not specific as to whether those communications consisted of real-time videos, photographs being exchanged, emails, text messages, some other means of communication, or some combination of the above. All he told AFOSI was that the communication had begun about a year before the relationship turned sexual, and consisted of communication over a gaming system, Microsoft Service Network (MSN), and Skype. AP did not specifically say that he had shared pictures or videos with Appellant, but he did not exclude this possibility either.

We recognize that neither the affidavit nor the search authorization is a model of clarity. As noted in the sub-issue immediately above, the search authorization permits the seizure of all "electronic media and power cords for devices capable of transmitting or storing online communications." The authorization does not further limit the search to any specific communications on those devices. However, the authorization also notes that AFOSI was investigating Appellant for allegedly violating a Florida statute. The Florida statute Appellant was suspected of violating broadly makes it a crime to use any "device capable of electronic data storage transmission" to entice a minor into engaging in an unlawful sexual act. The statute does not specify that any particular means of communication are necessary to constitute this offense. By specifically referring to this statute, and by mirroring the language of the Florida statute in defining the items to be seized, the magistrate was granting authorization to AFOSI to search the devices for any communications between Appellant and AP that would violate the state law. In addition, we may use AFOSI's affidavit to help define the scope of the search authorization, as the search authorization used language identical to that in part of the affidavit and the affidavit accompanied the search authorization. *See Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004). The affidavit further solidifies the position that AFOSI's search was to be limited to

evidence of communications that violated the state statute. The affidavit consistently referenced communications between Appellant and AP leading up to their sexual relationship, and referenced the Florida statute throughout. Under a constitutional standard of reasonableness, the search authorization provided AFOSI with sufficient guidance to determine the scope of its search and seizure. We therefore find that although the affidavit and search authorization could have been clearer, the search authorization was not constitutionally overbroad.[16]

Likewise, we find AFOSI did not exceed the scope of the search authorization. The agent who reviewed the FDE consistently testified that as he proceeded through computer files, his intent was to find evidence of communications between Appellant and AP. His choice to first search the "pictures" folder might not have been the most logical place to find this evidence (as AP had given no specific information indicating the two exchanged pictures), but it was not an *unreasonable* place to start, particularly when the agent testified that he started with the pictures folder because it was the first folder listed in the FDE. AP had told investigators that he had engaged in prolonged online communications with Appellant and that some of these communications were sexually explicit. Under these facts, it was reasonable to presume that images or videos were exchanged.[17] In addition, the agent promptly ceased the search when he found images of child pornography, exactly the conduct courts have repeatedly cited in distinguishing from cases where the scope of the warrant was exceeded. *Cf. United States v. Carey,* 172 F.3d 1268 (10th Cir. 1999), This case is also easily distinguishable from our decision in *Osorio* because the agent maintained his focus on the subject of the search warrant and promptly ceased the search when he discovered evidence of another crime. *Cf. Osorio*, 66 M.J. 632, 637 (A.F. Ct. Crim. App. 2008) ("Practitioners must generate specific warrants and search processes necessary to comply with that specificity and then, if they come across evidence of a different crime, stop their search and seek a new authorization.") We agree with the analysis of several federal circuit courts that investigators should not be limited in their searches for commingled computer files outside of the Fourth Amendment standard of reasonableness. AFOSI's search in this case—like the search authorization— was not perfect, but it was in reasonable conformance with the search authorization. We, therefore, hold that the military judge did not abuse his discretion in declining to suppress the child pornography images found during this search.[18]

---

[16] Air Force Information Management Tool (IMT) 1176, *Authority to Search and Seize*, should be amended to resolve these ambiguities. As currently drafted, the form contains a place for agents to list the premises or person to be searched, and the property to be seized. It does not further provide agents the opportunity to define how items seized from the premises or person are to be searched. It would be helpful to law enforcement agents, and better protect the privacy rights of individuals, to develop a form specifically tailored for the search and seizure of electronic evidence.
[17] While not germane to our analysis, it is worth noting that investigators did, in fact, find at least two images depicting Appellant and AP communicating online.
[18] We note one additional matter on this sub-issue. The Air Force Office of Special Investigations' request to the computer forensics laboratory asked the laboratory to "search" Appellant's electronic devices "for all videos, images and possible online communication . . . relating to the matter being investigated." The request did not specifically define the "matter being investigated," though it did focus on communications between Appellant and AP. The record

*D. Validity of Search Authorization*

Finally, Appellant contends that the search authorization was no longer valid by the time the search of the electronic devices was carried out because AFOSI failed to inform the military magistrate of a change in information that might affect his probable cause determination. After AP initially told local sheriffs that he and Appellant had engaged in a sexual relationship, AFOSI obtained the search authorization for Appellant's residence and seized the electronic devices. Before AFOSI could search those devices, however, AP contacted the sheriffs and recanted, saying he had only engaged in a friendly relationship with Appellant that had not progressed to sexual conduct. He then repeated his recantation in an interview with AFOSI. In these follow-up interviews, AP affirmed that he had engaged in online communication and that he was sexually attracted to Appellant. He also admitted that he had contacted Appellant after his initial interview with sheriffs, though he claimed Appellant did not try to get him to recant his earlier statement. Appellant asserts that the search authorization was no longer valid by the time the devices were searched because AFOSI did not tell the military magistrate about AP's later statements denying a sexual relationship with Appellant.

We review a military judge's decision to find probable cause existed to support a search authorization for an abuse of discretion. *United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005). "An abuse of discretion occurs if the military judge's findings of fact are clearly erroneous or if the decision is influenced by an erroneous view of the law." *United States v. Quintanilla*, 63 M.J. 29, 35 (C.A.A.F. 2006). "In reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996).

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause." A military magistrate issuing a search authorization must have a "substantial basis" for concluding that probable cause exists. *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007). Probable cause is a reasonable belief that the person, property, or evidence sought is located in the place to be searched. Mil. R. Evid. 315(f). Probable cause is evaluated by examining the "totality of the circumstances" to determine whether evidence is located at a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Leedy*, 65 M.J. at 212. It is a "fluid concept—turning on the assessment of probabilities in

---

indicates the laboratory was only supposed to extract computer files responsive to the investigator's request, although it is not altogether clear on this point. If the request to the laboratory only sought evidence of online communications between Appellant and AP, one might wonder why the forensic laboratory provided investigators with a forensic data extraction containing more than 10,000 images of child pornography. However, it appears as if a miscommunication might have been caused by the Florida statute Appellant was suspected of violating. The search authorization cited the Florida statute, which covers a wide array of misconduct related to computers and sexual acts, including child pornography. The title of the statute also contains the words "child pornography." Therefore, we find it entirely reasonable to believe that when the laboratory received the search authorization, the laboratory believed investigators were seeking evidence that included child pornography, even though investigators were not actually seeking such evidence. Under these facts, we find investigators should have been more specific in their request to the laboratory, but investigators and the laboratory committed no wrongdoing.

particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

In reviewing probable cause determinations, this court examines the information known to the magistrate at the time of his or her decision, and the manner in which the facts became known. *Bethea*, 61 M.J. at 187; *Leedy*, 65 M.J. at 214. If the defense makes a substantial preliminary showing that a government agent included a false statement knowingly and intentionally or with reckless disregard for the truth in the information presented to the magistrate, and if the allegedly false statement is necessary to the finding of probable cause, the defense upon request shall be entitled to a hearing. Mil. R. Evid. 311(g)(2). However, if the material that is the subject of the alleged falsity or reckless disregard is set aside, and a sufficient showing of probable cause remains, no hearing is required and the search authorization or warrant remains valid. *Franks v. Delaware*, 438 U.S. 154 171–72 (1978); *United States v. Cowgill*, 68 M.J. 388, 393 (C.A.A.F. 2010). "Even if a false statement or omission is included in an affidavit, the Fourth Amendment is not violated if the affidavit would still show probable cause after such falsehood or omission is redacted or corrected." *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001) (quoting *Technical Ordinance, Inc. v. United States*, 244 F.3d 641, 647 (8th Cir. 2001)). "Logically, . . . the same rationale extends to material omissions." *United States v. Mason*, 59 M.J. 416, 422 (C.A.A.F. 2004). Therefore, for the defense to be entitled to relief due to matters not presented to the magistrate, "the defense must demonstrate that the omissions were *both* intentional or reckless, *and* that their hypothetical inclusion would have prevented a finding of probable cause." *Id.* (citing *United States v. Figueroa*, 35 M.J. 54, 56–57 (C.M.A. 1992)).

We note that AP's statements recanting his earlier claims of a sexual relationship with Appellant were made after the military magistrate granted search authorization. However, the electronic devices had only been seized—not searched—at the time AP recanted, and at a minimum, honest and thorough investigative work required that this information be presented to the magistrate. We, therefore, assume without deciding that AFOSI's failure to bring this new information to the military magistrate constitutes either an intentional act or a reckless disregard for the truth. *See United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) ("When a definite and material change has occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists. Therefore, the magistrate must be made aware of any material new or correcting information.")

However, we hold that despite this omission, probable cause would have still existed had this matter been brought to the magistrate's attention. AP's recantations came only after AP contacted Appellant to inform him of his statements to investigators, and we find that his earlier, detailed statements about the nature of their sexual relationship would have

convinced a military magistrate far more than his later, suspicious recantation.[19] Also, AP did not specifically recant his claims that he and Appellant had engaged in sexually-oriented communications online. The Florida statute Appellant was suspected of violating criminalizes use of electronic means to "seduce, solicit, lure, or entice" a child to engage in unlawful sexual conduct. It is not necessary for sex to actually result from the communication in order for a crime to be completed. Therefore, the military magistrate would certainly have maintained his earlier grant of search authorization even if he had been informed of AP's later statements.

We have also reviewed Appellant's *Grostefon* submissions on this issue (Issue XXIX), which largely build on the arguments of counsel concerning this sub-issue. Appellant generally asserts that the information provided to the magistrate failed to demonstrate that any recent communications with AP were stored on Appellant's computer media, or that any media containing such communications would be in his Tyndall AFB home as opposed to some other location.[20] We find Appellant's *Grostefon* submission on this issue does not change our position outlined above. The military magistrate was provided with a sufficient basis to believe that electronic evidence existed on Appellant's computer media in his Tyndall AFB home.

*E. Conclusion: Search and Seizure Issues*

We have considered the voluminous filings submitted both at trial and on appeal concerning the various Fourth Amendment issues raised in this case. We have also specifically considered Appellant's *Grostefon* submissions concerning several aspects of the November 2011 searches and seizures (Issue XXXI). The *Grostefon* submissions generally cover the same alleged errors as presented in appellate defense counsel's assignment of errors but raise different variations and arguments concerning these matters. The *Grostefon* submissions generally allege the search authorization did not particularly describe the places to be searched and the items to be seized. Having considered the totality of the filings concerning the searches and seizures, including Appellant's *Grostefon* submissions, we find Appellant is not entitled to relief on any aspect of this issue and see no need to specifically comment on Appellant's *Grostefon* submissions regarding this matter. *See Matias*, 25 M.J. at 363.

The actions of AFOSI were not perfect. Ideally, AFOSI should have: (1) more specifically listed in the search authorization application what aspects of Appellant's electronic devices it wanted to search and what types of evidence it expected to find on these devices; (2) specified in the affidavit accompanying the search authorization that it was seeking evidence of videos and images, not just text-based communications, and why it believed this evidence was present; (3) better defined what types of evidence the forensics

---

[19] Appellant successfully moved this court to attach a video recording of AP's recantation interview with Air Force investigators to the record. The recording demonstrates AP's denials in the later interview lack credibility.

[20] Appellant's argument is based in part on his assertion that he was not stationed at Tyndall Air Force Base until August 2010, leading to the possibility that the communications could have occurred before his arrival in Florida.

laboratory was expected to provide on the FDEs; (4) outlined a clear search methodology for searching the FDEs, starting in folders where evidence of the crime being investigated was most likely to be found; and (5) informed the military magistrate of AP's recantations concerning the sexual relationship. However, model investigative practice is not the Fourth Amendment standard. Instead, the standard is reasonableness. Despite these shortcomings, AFOSI presented the military magistrate with evidence demonstrating probable cause that Appellant had used his electronic devices to communicate with AP in an attempt to develop a sexual relationship with the child. The search authorization and the accompanying affidavit listed a specific state statute Appellant was suspected of violating, and the search and seizure language attempted to use language that modeled the state statute. AFOSI's search of the devices remained focused on finding evidence of that crime. When the investigator came across evidence of Appellant's possession of child pornography, he promptly stopped the search and obtained a new search authorization. We find the totality of AFOSI's actions in this case either fall within the confines of reasonableness or are of such a nature that exclusion of the evidence would not meaningfully deter any potential police misconduct, and the military judge did not abuse his discretion in declining to suppress any evidence gathered as a result of the searches and seizures in this case.

### III. Issue II:  Ineffective Assistance of Counsel Allegation— Disclosure of Confidential Information

Appellant was placed in pretrial confinement on 12 March 2012 after he violated a no-contact order with AP. Captain (Capt) CH was Appellant's assigned area defense counsel during this time. Capt CH's representation included helping Appellant get his no-contact order modified and representing Appellant during the pretrial confinement hearing.

While Appellant remained in pretrial confinement, AFOSI received additional authorization to search Appellant's house. That search, conducted on 2 April 2012, resulted in the seizure of a password-protected external hard drive. The laboratory conducting the forensic examination of the hard drive subsequently informed AFOSI it may take weeks or months to crack the password and examine the hard drive, if the hard drive could be accessed at all.

During the initial briefing of this case and relying solely on information in the AFOSI report, Appellant alleged that on or about 18 May 2012, Capt CH met with Capt MT (assistant trial counsel) concerning the case. During this meeting, Capt CH allegedly told Capt MT that, shortly after Appellant was placed in pretrial confinement, Appellant had asked a friend, Mr. PK, to remove items from the house. This led Capt MT to call Mr. PK and learn that Mr. PK had recently removed a number of items from Appellant's home and taken them to Appellant's mother's house in New Jersey. AFOSI agents used this information to obtain a search warrant for Appellant's mother's home. The search located a paper with handwritten account information on it, including passwords. The computer forensics laboratory was able to use this password information to access the hard drive.

The hard drive contained images of child pornography that formed the basis of a specification of which Appellant was convicted.

In sum, Appellant alleged Capt CH violated the duty of confidentiality and the duty of loyalty under Air Force Rule of Professional Conduct 1.6 by disclosing information Capt CH gained from Appellant which then led to the discovery of evidence adverse to Appellant. Appellant asserts that Capt CH learned about Mr. PK's activities in Appellant's house through his representation of Appellant, and, by disclosing this information to trial counsel without Appellant's consent and leading the Government to discover evidence adverse to Appellant, Capt CH's representation fell measurably below the performance ordinarily expected of fallible lawyers. *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991).

Following an order from this court, the government submitted declarations concerning this issue from Capt MT and Capt CH. In response to these declarations, Appellant then submitted his own declaration.

After reviewing the declarations, the record of trial, and the parties' briefs, and after hearing oral argument, we determined we could not resolve this assignment of error without ordering a post-trial hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). A military judge conducted the hearing, thoroughly covering the specific questions we ordered to be addressed. The military judge issued the following findings of fact:

In 2011, Appellant and Capt CH entered into an attorney-client relationship concerning a no-contact order. The attorney-client relationship continued until Capt CH separated from the Air Force in the summer of 2012.

On 12 March 2012, Appellant was placed in pre-trial confinement. That same day, AFOSI agents searched Appellant's on-base home pursuant to a search authority. The next day, Capt CH met with his client at the confinement facility. Appellant asked Capt CH to contact Mr. PK in order to move Appellant's dog, car, and some other personal items to the home of Appellant's mother in New Jersey. Capt CH represented Appellant at the pretrial confinement hearing on 14 March 2012 and confinement was continued.

Shortly thereafter, Capt CH contacted Mr. PK about Appellant's request. Mr. PK and Appellant spoke on the telephone in the presence of Capt CH about the plan for Mr. PK to fly to Florida and then drive Appellant's car with the dog to his mother's home in New Jersey.

On 17 March 2012, Mr. PK arrived in Florida. Capt CH met Mr. PK off-base and provided him with Appellant's keys to his car and residence. Capt CH also arranged for Mr. PK to meet with Appellant in the confinement facility the next day. At the meeting,

Appellant provided Mr. PK with a list of items he wanted moved to his mother's home and their location in the house. Appellant did not ask Mr. PK to keep this meeting confidential or secret; Capt CH had arranged the meeting but was not present. Subsequently, Mr. PK went to Appellant's home, found most of the listed items and placed them and the dog in the car which he then drove to Appellant's mother's home.

On 2 April 2012, AFOSI agents again searched Appellant's home. Afterwards, they informed Capt MT that it appeared that someone had removed items from Appellant's home since AFOSI last searched it. Capt MT spoke to Capt CH about this issue. Surprised this was an issue, Capt CH told Capt MT there was nothing to worry about as a friend of Appellant had come to Florida to retrieve the dog, car, and some other items. Capt CH provided Capt MT with Mr. PK's name and phone number. Capt MT contacted Mr. PK, who confirmed he removed some items from Appellant's home and moved them to the home of Appellant's mother in New Jersey.

Using the information from Mr. PK, AFOSI agents prepared an affidavit in support of a search warrant for the New Jersey house. After the warrant was issued, a search of the home resulted in the seizure of a list of Appellant's various account information and passwords. This list was used to gain access to the contents of the password-protected hard drive previously seized from Appellant's home. Although law enforcement had been actively seeking ways to bypass the password protection, it is not clear that those efforts would have been successful. The information found on the hard drive is the evidence used at trial to support the charge of possession of child pornography.

We adopt these findings of fact as our own as they are supported by the record and are not clearly erroneous. *See United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007).

In reviewing claims of ineffective assistance of counsel, we look at the questions of deficient performance and prejudice de novo. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012); *United States v. Gutierrez*, 66 M.J. 329, 330–31 (C.A.A.F. 2008). To establish ineffective assistance of counsel, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under the first prong, Appellant has the burden to show that his "counsel's performance fell below an objective standard of reasonableness—that counsel was not functioning as counsel within the meaning of the Sixth Amendment." *United States v. Edmond*, 63 M.J. 343, 351 (C.A.A.F. 2006). The question is therefore whether "the level of advocacy falls measurably below the performance ordinarily expected of fallible lawyers." *United States v. Haney*, 64 M.J. 101, 106 (C.A.A.F. 2006) (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)) (brackets and ellipsis omitted). Under the second prong, the deficient performance must prejudice the accused through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007)

(quoting *Strickland*, 466 at 687). Actions by an attorney "that contravene the canons of legal ethics, do not necessarily demonstrate prejudice under the second prong of *Strickland.*" *United States v. Saintaude*, 61 M.J. 175, 180 (C.A.A.F. 2005). Counsel is presumed competent until proven otherwise. *United States v. Anderson,* 55 M.J. 198, 201 (C.A.A.F. 2001).

> Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys. As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege.

*Fisher v. United States*, 425 U.S. 391, 403 (1976) (citations omitted).

"The loyalty of defense counsel to his client—before, during, and after trial—is a cornerstone of military justice." *United States v. Schreck*, 10 M.J. 226, 228 (C.M.A. 1981). Air Force Rule of Professional Conduct 1.6 states that a lawyer "shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are implicitly authorized in order to carry out the representation, and except as stated in paragraph (b)." Paragraph (b) sets forth certain exceptions to that general rule, including where disclosure is reasonably believed necessary "to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm, or substantial impairment of national security or the readiness or capability of a military unit, vessel, aircraft, or weapons system."

Military cases involving defense counsel disclosing evidence to the government are rare.

In *United States v. Province*, 45 M.J. 359 (C.A.A.F. 1996), the appellant failed to return from liberty for a time before surrendering himself. When he surrendered himself, authorities issued him "straggler's orders" that directed him to report to his original command at Marine Corps Base Quantico. *Id.* at 360. Province acknowledged these orders but failed to present himself at Quantico. *Id.* He was originally charged with one

specification of unauthorized absence covering the entire period. *Id.* However, trial defense counsel then turned over a copy of the straggler's orders Province had given to him to trial counsel in pretrial negotiations, anticipating that this issue would come out during the providence inquiry and might complicate the plea. *Id.* He also hoped Province's earlier voluntary return might serve as mitigation. *Id.* Trial counsel used this to have a second specification of unauthorized absence referred, splitting the entire period into two segments. *Id.* at 360–61.

On appeal, our superior court examined three issues relating to the disclosure of the straggler's orders: (1) whether disclosure of the orders violated Rule 1.6 of the American Bar Association Model Rules of Professional Conduct; (2) whether disclosure of the document was required by Rule 3.4 of the Model Rules, which prevents a party from denying or blocking another party's access to evidence and material having potential evidentiary value; and (3) whether trial defense counsel's disclosure of the document amounted to ineffective assistance of counsel. *Id.* at 361–63. The court held that disclosure of the orders did not violate Rule 1.6 because the disclosure was made to further effective representation. *Id.* at 362. The second question, the court held, was "a difficult one" because it was not clear whether the straggler's orders were already accessible to the government (and thus not covered by Rule 3.4) or whether trial defense counsel would have been "concealing" evidence by not disclosing his possession of the orders. *Id.* The court held that the government had an equal opportunity to possess a copy of the orders, and therefore there was no obligation for trial defense counsel to turn them over. The court noted this was a "close call, and each case depends upon its unique circumstances." *Id.* at 363. Finally, the court held trial defense counsel was not ineffective because the client achieved a favorable result at trial. *Id.*

In another case, *United States v. Ankeny*, 28 M.J. 780 (N.M.C.M.R. 1989), *aff'd*, 30 M.J. 10 (C.M.A. 1990), the appellant told his defense attorney that he had unsuccessfully attempted to get the officer in charge of urinalysis collection to switch his sample with another one. Defense counsel revealed this to an assistant staff judge advocate, and Ankeny was convicted based on the officer's testimony. *Id.* at 781. The court found ineffective assistance of counsel without much additional analysis. *Id.* at 784.

In *United States v. McCluskey*, 20 C.M.R. 261 (C.M.A. 1955), the court found that a judge advocate used a confidence tendered during legal assistance to obtain evidence to be used in his later prosecution. The court held that evidence developed as a result of a breach of the attorney-client privilege may not be used to convict the client. *Id.* at 268.

Although Appellant would have us focus solely on the duty of confidentiality, trial defense counsel also has other duties to opposing counsel and the integrity of the system. "A lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value.

A lawyer shall not counsel or assist another person to do any such act." Air Force Rule of Professional Conduct, Rule 3.4(a).

At the time that Capt CH was facilitating Mr. PK's assistance in moving his client's dog, car, and some personal items to another location, he did not believe the items being moved had evidentiary value. Our superior court has recognized that "each case depends upon its unique circumstances" in determining when a trial defense counsel is required to provide the prosecution with evidence obtained from or through representation of their client. *Province,* 45 MJ at 363. Capt CH knew that items had been removed from Appellant's home and he had facilitated their removal. There was no error in Capt CH taking reasonable measures to ensure that the Government's access to items that later determined to have *potential evidentiary value* was not obstructed by his well-intentioned, but perhaps short-sighted and misguided, actions. [21]

Furthermore, Appellant's communications to Capt CH about Mr. PK were not privileged. The communications were intended to be relayed to the third party, Mr. PK, or occurred in his presence. It is well established that material is not privileged if it is intended to be disclosed to a third-party. *United States v. Marcum,* 60 M.J. 198, 211 (C.A.A.F. 2004) (Crawford, J. dissenting) (citing *Cavallaro v. United States*, 284 F.3d 236, 246–47 (1st Cir. 2002)). Appellant argues that the rules on confidentiality do not mirror the rules on privilege and this exception should not apply. We disagree. Appellant's communication to Capt CH about Mr. PK and moving his dog, car, and some personal effects to New Jersey were not confidential in this circumstance. The communications were intended to be relayed to a third-party and occurred in front of this same third party. The communications were not related to the representation of either the no-contact orders or the pretrial confinement hearing. At the *DuBay* hearing the trial judge expressly found that "the matters relating to [Mr. PK] were in the form of a personal, non-legal request." We agree. We acknowledge that Mr. PK's involvement may not have been necessary if Appellant had not been confined, however, that does not equate into Capt CH's help in finding a home for Appellant's dog as being part of the representation.

Even if the communications were confidential, we are not convinced Appellant is able to establish prejudice in the circumstances of this case. The alleged prejudice is that Capt CH's disclosure about the identity of Mr. PK led to the search warrant issued for the home of Appellant's mother. The third prong of the ineffective assistance of counsel claims requires Appellant to show there is a reasonable probability that, absent the errors, there would have been a different result at trial. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). Therefore, we look to see if the Government would have identified Mr. PK through other methods in the absence of Capt CH's statements. We conclude they would have identified him as a potential witness. Appellant's phone calls in pretrial

---

[21] In order to avoid ethical dilemmas, we recommend that trial defense counsel not be involved in facilitating the removal of items from their client's home.

confinement were monitored and recorded. Capt MT regularly listened to these recordings and reviewed Appellant's confinement visitor log. Capt MT had previously interviewed individuals identified through their contact with the confined Appellant. Mr. PK was both in the visitor log book and in the phone call recordings. The Government would have interviewed Mr. PK. Our conclusion is that the result of the trial would have been the same regardless of Capt CH's intemperate statements.

To be clear, we do not commend the actions of trial defense counsel in this case. Ensuring the welfare of his client's dog was not a legal responsibility and should have instead been addressed by Appellant's first sergeant, commander, or other designee. If defense counsel are asked about matters related to their client that potentially could be viewed as revealing privileged or confidential information, we highly recommend they consult with their supervisors before making any statements. "We believe that contacting one's state bar licensing body and using the *ex parte* hearing with the military judge for close questions like this would be advisable." *Province*, 45 M.J. at 363.

## IV. Issues III and XVII—R.C.M. 707

Appellant next alleges that his right to speedy trial under R.C.M. 707 was violated in two respects. First, he alleges that the special court-martial convening authority (SPCMCA) abused his discretion in excluding 44 days of pretrial confinement from the R.C.M. 707 clock. Second, he alleges the SPCMCA abused his discretion in excluding an additional 20 days of pretrial confinement from the R.C.M. 707 clock. We disagree.

"The conclusion whether an accused received a speedy trial is a legal question that is reviewed do novo . . . ." *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003) (quoting *United States v. Doty*, 51 M.J. 464, 465 (C.A.A.F. 1999)).

R.C.M. 707 generally requires the government to arraign an accused within 120 days after the earlier of preferral of charges, the imposition of restraint, or entry on active duty. However, R.C.M. 707(c) permits all pretrial delays approved by the military judge or convening authority to be excluded from the calculation of the 120-day requirement. "The decision to grant or deny a reasonably delay is a matter within the sole discretion of the convening authority or a military judge. The decision should be based on the facts and circumstances then and there existing." R.C.M. 707(c), Discussion. "Pretrial delays should not be granted ex parte, and when practicable, the decision granting the delay, together with supporting reasons and the dates covering the delay, should be reduced to writing." *Id.* In reviewing a convening authority's decision to exclude time from the R.C.M. 707 calculation, "the issue is not which party is responsible for the delay but whether the decision of the officer granting the delay was an abuse of discretion." *United States v. Lazauskas*, 62 M.J. 39, 41–42 (C.A.A.F. 2005).

The record reveals the following timeline relevant to our analysis of both speedy trial issues:

| Date | Days following imposition of pretrial confinement | Activity |
|------|------|------|
| 12 Mar 12 | 0 | Appellant entered pretrial confinement |
| 23 Apr 12 | 42 | Appellant's first request for speedy trial |
| 9 May 12 | 58 | Appellant's commander forwarded memo to general court-martial convening authority informing him of delay in forwarding charges (justification: awaiting forensic analysis of Appellant's computer hardware) |
| 10 May 12 | 59 | Appellant's second request for speedy trial |
| 15 May 12 | 64 | Preferral package forwarded to general court-martial convening authority's legal staff for review |
| 7 Jun 12 | 87 | Appellant's third request for speedy trial |
| 20 Jun 12 | 100 | Government requested exclusion of time from R.C.M. 707 speedy trial clock (justification: did not expect forensic analysis to be completed until roughly 15 July 12) |
| 28 Jun 12 | 108 | Majority of charges preferred |
| 2 Jul 12 | 112 | SPCMCA excluded period from 15 May 12 until 27 June 12 (44 days) for speedy trial purposes. The defense opposed excluding this period. |
| 9 Jul 12 | 119 | SPCMCA excluded 20 days for speedy trial purposes in a letter appointing the Article 32, UCMJ, investigating officer. |
| 6 Aug 12 | 147 | Article 32, UCMJ, investigative hearing |
| 15 Aug 12 | 156 | Article 32, UCMJ, investigating officer completed his report |
| 20 Aug 12 | 161 | Additional charge preferred |
| 27 Aug 12 | 168 | Charges referred to general court-martial |

| | | |
|---|---|---|
| 30 Aug 12 | 171 | Trial defense counsel moved to dismiss charges for Article 10, UCMJ, speedy trial violation |
| 5 Sep 12 | 177 | Arraignment |
| 19 Feb 13 | 344 | Military judge denied defense motion to dismiss for Article 10, UCMJ, speedy trial violation; trial began after several Article 39(a), UCMJ, sessions to resolve defense motions and other issues |

177 total days elapsed between the imposition of pretrial confinement and arraignment. However, the SPCMCA excluded a total of 64 days from this period, reducing the number of days under the R.C.M. 707 clock to 113. Therefore, if the SPCMCA properly excluded these days, no R.C.M. 707 violation occurred.

*A. 44-Day Exclusion*

The Government's basis for the requested exclusion from 15 May 2012 to 27 June 2012 was that it needed time to analyze Appellant's computer media devices. The basis for the Government's request was as follows:

> First, the vast majority of the evidence in this case will derive from the scientific findings of [the Defense Computer Forensics Laboratory]. Therefore, it is important to await for final forensic examination of the computer media equipment to assess the nature of the evidence against [Lieutenant Colonel] Richards and to examine the true extent of his criminal conduct. To date we have received only piecemealed bits of evidence and while the evidence received clearly depict[s] criminal misconduct, we have yet to receive the full and complete forensic analysis that will truly shape the final charges against [Lieutenant Colonel] Richards. The government too, has a right to a fair trial and we submit that justice requires that [Lieutenant Colonel] Richards be brought to trial for all possible criminal misconduct.

The Government noted that one of the hard drives was encoded with password protection (as discussed in Issue II above) and that the forensics laboratory simply needed more time to complete its examination based on the number of devices to be analyzed and the amount of suspected child pornography on these devices. The Government also provided the convening authority with a timeline of its efforts to timely bring this case to trial.

At trial, the Defense challenged this exclusion of time.[22] The Defense asserted that this period should not have been excluded for three reasons: (1) the Government's stated reason for the exclusion (to allow the forensics laboratory more time to conduct its analysis) was not valid because the Government received most of the information it needed from the laboratory before the excluded period, (2) numerous delays requested by the Government contradicted its claim that it was moving this case along as quickly as possible, and (3) the delay prejudiced Appellant.

The military judge denied the Defense's motion. Concerning the 44-day exclusion, he noted that the Government had provided the SPCMCA with a "detailed description of computer-related matters requiring further investigation, along with the legal analysis to why the requested exclusion was appropriate."

We find no error in the military judge's ruling or in the SPCMCA's decision to exclude this 44-day period from the R.C.M. 707 calculation. The discussion to R.C.M. 707(c) specifically provides that allowable reasons to exclude time might include "time to enable counsel to prepare for trial in complex cases" and "time to secure the availability of . . . substantial witnesses, or other evidence." This was certainly a complex case, requiring the forensic examination of multiple media devices on which extensive amounts of child pornography was found. It is true that, as the Defense asserted, much of the evidence from the forensics laboratory was already available to the Government. However, it was not unreasonable for the Government to wait for the remainder of this evidence before preferring charges, as the Government undeniably had an interest in ensuring Appellant's court-martial captured all aspects of his diverse and extended misconduct. *See United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007). The Government ultimately decided to prefer charges before receiving the final forensics report, but this does not undercut the Government's stated reasons for excluding this period. Rather, it demonstrates that the Government was sensitive to the need to try this case in a timely manner. The SPCMCA acted appropriately in excluding this 44-day period.

*B. 20-Day Exclusion*

On 9 July 2012, the SPCMCA excluded the period from 9 July 2012 to 30 July 2012 from the R.C.M. 707 calculation. The SPCMCA found that the Government was ready to proceed with the Article 32, UCMJ, investigative hearing on 9 July, but civilian defense counsel was unavailable until 30 July. Appellant alleges the SPCMCA erred in two respects: (1) trial defense counsel had already advised the Government that Appellant wanted to proceed with the hearing as soon as possible and was willing to waive the presence of his civilian defense counsel to facilitate an earlier hearing date; and (2) the

---

[22] The Defense's first motion to dismiss for a violation of Rule for Courts-Martial 707 did not challenge the 44-day exclusion. Rather, the Defense, not realizing the later 20-day exclusion had been granted, asserted that the 120-day period had been exceeded. After the Government noted the 20-day exclusion and the military judge denied the motion to dismiss, the Defense filed another motion to dismiss, this time asserting that the convening authority abused his discretion in excluding both periods of time.

Defense did not receive an opportunity to provide input to the SPCMCA before the exclusion decision was made.

We find no error in the SPCMCA's decision to exclude this period of time, nor in the military judge's ruling denying the Defense's motion to dismiss for an R.C.M. 707 violation. Appellant correctly notes that prior to 9 July 2012, trial defense counsel had informed the Government of Appellant's desire to proceed to an investigative hearing as soon as possible and of his willingness to waive civilian defense counsel's appearance at the hearing if necessary to facilitate a timely hearing. However, after this representation, Appellant hired a new civilian defense counsel. On 26 June 2012, a government representative emailed the new civilian defense counsel, along with the military defense counsel who had earlier communicated Appellant's wishes. The government representative asked the two defense counsel when in July they were available to conduct the hearing. In a series of emails, civilian defense counsel represented that he was not available until 30 July. Military defense counsel was copied on all these messages, yet did nothing to re-emphasize his earlier representation of Appellant's wishes. Instead, when discussion took place about a possible 6 August hearing date, military defense counsel stated, "that would work out better for me." Based on this, the government representative was left with the reasonable impression that Appellant now wanted his new civilian defense counsel to represent him, and that the defense team was not available until 30 July 2012. The Government committed no error in communicating this to the SPCMCA, and the SPCMCA committed no error approving this 20-day exclusion.

Appellant also alleges that he should have received an opportunity to contest the requested exclusion to the SPCMCA. The discussion to R.C.M. 707(c) provides: "Pretrial delays should not be granted ex parte . . . ." The discussion does not elaborate on the nature of this requirement, and case law has not addressed the significance of this discussion. In general, the discussion to the Rules for Courts-Martial does not provide a binding source of law. *Willenbring v. Neurauter*, 48 M.J. 152, 168 (C.A.A.F. 1998) (observing that the discussion sections of the Rules for Courts-Martial "are not part of the Manual and . . . . do not contain official rules or policy"). In any event, the Government sought out the Defense's position as to when it was available to conduct the investigative hearing. In writing, the Defense affirmatively represented that it was not available until 30 July. The Government accurately conveyed the Defense's position to the SPCMCA, and the SPCMCA acted on the position defense counsel had articulated. We find no error in the method by which the SPCMCA was informed of the parties' positions on this requested delay.

Finally, we have examined Appellant's *Grostefon* claim of ineffective assistance of counsel related to this issue. Appellant alleges that his civilian defense counsel was ineffective by failing to object to the convening authority's 20-day exclusion of time. He argues that his counsel apparently failed to read the letter, because trial defense counsel's first motion to dismiss under R.C.M 707 failed to recognize that the 20-day period had

been excluded. We find no basis for relief under this claim because even assuming civilian defense counsel was ineffective in this regard, no prejudice resulted. Trial defense counsel did ultimately challenge this 20-day exclusion before the military judge, and the military judge denied relief. As discussed above, we concur with the military judge's ruling.

*V. Issue IV: Article 10, UCMJ*

Appellant next raises another speedy trial issue, this time alleging a violation of Article 10, UCMJ, 10 U.S.C. § 810. Under this issue, he generally challenges the entire period from the time he was placed in pretrial confinement until the date of trial, alleging that the length of the delay in bringing him to trial constitutes an Article 10, UCMJ, speedy trial violation. He specifically alleges that the Government's argument that it was waiting on the forensic analysis of Appellant's computer media is insufficient, as that examination was not aimed at discovering evidence relevant to the charged misconduct. He also focuses on specific delays that occurred within the overall processing of his case, such as the delay between imposition of pretrial confinement and preferral of charges; the delay between preferral and the Article 32, UCMJ, investigation; and the delay in forwarding a memo stating why charges were not being preferred in a reasonable manner.

We review the issue of whether the Government has violated Article 10, UCMJ, de novo, giving substantial deference to a military judge's findings of fact. *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2003).

When a servicemember is placed in pretrial confinement, "immediate steps shall be taken" to inform the accused of the charges and to either bring the accused to trial or dismiss the charges. Article 10, UCMJ. Unlike R.C.M. 707, Article 10, UCMJ, does not provide a specific time period within which the accused must be brought to trial. Article 10, UCMJ, creates "a more stringent speedy trial standard than the Sixth Amendment."[23] *Cossio*, 64 M.J. at 256. Nonetheless, the factors set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), that are used to analyze Sixth Amendment speedy trial issues "are an apt structure for examining the facts and circumstances surrounding an alleged Article 10 violation." *Mizgala*, 61 M.J. at 127. Those factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) whether Appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Id.* at 129.

While the *Barker* factors are relevant to our Article 10, UCMJ, analysis, "Sixth Amendment speedy trial standards cannot dictate whether there has been an Article 10 violation." *Id.* at 127. Instead, we "use the [Sixth Amendment] procedural framework to analyze Article 10 claims under the 'immediate steps' standard of the statute and the applicable case law." *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010). Article 10, UCMJ, does not demand "constant motion, but reasonable diligence in bringing the charges to trial." *United States v. Tibbs*, 35 C.M.R. 322, 325 (C.M.A. 1965). "Short

---

[23] U.S. CONST. amend. VI.

periods of inactivity are not fatal to an otherwise active prosecution." *Mizgala*, 61 M.J. at 127. In reviewing whether the demands of Article 10, UCMJ, have been satisfied, "we remain mindful that we are looking at the proceeding as a whole and not mere speed." *Id.* at 125.

The military judge found as facts a chronology prepared by the installation deputy staff judge advocate and the information in an affidavit prepared by the installation chief of military justice. These documents generally detailed Government activity during the time leading up to arraignment, such as conducting the pretrial confinement hearing, investigating the suspected offenses, interviewing witnesses, attempting to identify potential victims, drafting a proof analysis, and coordinating with local law enforcement officials. In a short written ruling, the military judge denied the motion to dismiss, finding the Government took immediate steps to bring Appellant to trial.

We accept the military judge's findings of fact insofar as they establish actions of the Government leading to Appellant's arraignment. We review de novo whether those facts demonstrate a lack of reasonable diligence under Article 10, UCMJ, beginning with an analysis of the *Barker* factors.

## A. Length of the Delay

The first factor under the *Barker* analysis is the length of the delay. This factor serves as a "triggering mechanism," meaning that unless the period of delay is unreasonable on its face, "there is no necessity for inquiry into the other factors that go into the balance." *Cossio*, 64 M.J. at 257 (quoting *United States v. Smith*, 94 F.3d 204, 208–09 (6th Cir. 1996)). In *Cossio*, our superior court held that a full *Barker* analysis was appropriate where the accused had made a timely demand for a speedy trial and had been held in continuous pretrial confinement for 117 days after he moved for relief. *Id.* Likewise, in *Mizgala*, a 117-day period was sufficiently unreasonable to warrant further analysis. *Mizgala*, 61 M.J. at 128–29. In *Thompson*, a 145-day period of pretrial confinement triggered the full Article 10, UCMJ, inquiry. *Thompson*, 68 M.J. at 312; *see also United States v. Kossman*, 38 M.J. 258, 261 (C.M.A. 1993) ("We see nothing in Article 10 that suggests that speedy-trial motions could not succeed where a period under 90—or 120—days is involved."). We recognize that this was a complicated case involving allegations of prolonged and diverse misconduct over an extended period of time at multiple locations, and we have accounted for this in determining how much weight to give this factor. We, nonetheless, find that this factor weighs slightly in Appellant's favor and that the delay is sufficiently unreasonable on its face to trigger further analysis of the remaining *Barker* factors and Article 10, UCMJ.

## B. Reasons for the Delay

The chronology and affidavit adopted as facts by the military judge reveal the Government was engaged in significant activity throughout the 177-day period leading up

to arraignment. Appellant was placed in pretrial confinement after he was observed breaking a no-contact order with a teenager who had stated he had a sexual relationship with Appellant. Appellant's continued misconduct led AFOSI to execute additional searches of Appellant's home, car, and office. These searches resulted in the discovery of additional images of child pornography that ultimately formed the basis for a specification referred to trial. The external hard drive on which this child pornography was found was password protected, causing significant delay in analyzing it. Ultimately, Appellant's mother's home in New Jersey had to be searched to find evidence relevant to the case, as outlined in Issue II above. While the facts found by the military judge reveal some minor gaps, they leave no doubt that the Government engaged in significant activity throughout the 177-day period.

The Government had the opportunity to conduct its preparations and investigations in large part because it decided to await forensic examination of Appellant's computer media devices. Appellant alleges this was not an acceptable reason for the delay in bringing him to trial; we disagree. In a similar circumstance, our superior court in *Cossio* held that the government was entitled to wait on a forensic examination of the accused's computer equipment before bringing the accused to trial, even though other evidence existed of the accused's guilt. The court concluded that "it was not unreasonable for the Government to marshal and weigh all evidence, including forensic evidence, before proceeding to trial." *Cossio*, 64 M.J. at 257. When the Government initially decided to wait on the examination, it reasonably believed it needed that evidence to go forward. That decision ultimately proved correct, as the testimony of the expert who conducted the forensic examination was critical to securing the conviction on the possession of child pornography specification. We see nothing unreasonable in the Government's decision to await the forensic examination, especially where it used that time to take necessary steps to investigate and prepare the case for trial.[24] This factor weighs in favor of the Government.

## C. Speedy Trial Request

Appellant submitted three speedy trial requests in the initial months after his placement in pretrial confinement. The Government argues that these requests were "nothing more than transparent attempts to manufacture an issue for appeal," because, at the same time Appellant was requesting a speedy trial, he was also seeking individually-detailed defense counsel, something he knew would result in a delay if granted. We decline the invitation to read more into Appellant's speedy trial requests. Appellant made

---

[24] Appellant also alleges that much of the period during which the forensic examination was being conducted was spent waiting for a "taint review" of the material on Appellant's electronic devices. The stated purpose of this review was to ensure that the Government did not review material protected by the attorney-client privilege. Appellant alleges this rationale is deficient because, at the time he was placed into pretrial confinement, he was assigned to represent the government in utility law litigation; therefore, no taint concerns would be present. We reject this argument. The record reveals Appellant had previously been an area defense counsel assigned to represent servicemembers in military justice actions. It was reasonable for the Government to believe that Appellant's electronic devices might contain protected information relating to his representation of servicemembers. We see nothing unreasonable in the Government's precautionary step of conducting the taint review.

his requests before charges were preferred and before the Article 32, UCMJ, investigation. We fail to see how requesting appointment of a specifically-named counsel would necessarily result in delay, and we see nothing inherently disingenuous about Appellant's speedy trial requests. This factor weighs in favor of Appellant.

*D. Prejudice*

Appellant asserts he suffered prejudice from the delay in bringing him to trial in the following ways: (1) the conditions of his pretrial incarceration were oppressive, as he was housed with post-trial inmates; (2) he suffered anxiety while awaiting the resolution of charges, particularly in enduring roadblocks in securing adequate medical care; and (3) his defense was impaired because he did not have unfettered access to his trial defense counsel and legal resources to research issues in preparation of his defense. We disagree that these situations constitute prejudice resulting from the delay in bringing him to trial.

The Supreme Court has established the following test for prejudice in the Sixth Amendment speedy trial context:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker*, 407 U.S. at 532 (footnote omitted).

We find that Appellant has failed to demonstrate prejudice under any of these three interests. As to the first, Appellant correctly notes that the military judge awarded him 75 days of additional credit toward his sentence to confinement under R.C.M. 305(k) for inconveniences such as a leaky roof, short-term commingling with post-trial confinees, limited access to fitness and recreational equipment, difficulty obtaining certain allergy medications, and problems with the facility's heating system. However, such violations hardly rendered Appellant's pretrial confinement overly harsh or oppressive. As to the second interest, Appellant has not identified "particularized anxiety and concern greater than the normal anxiety and concern associated with pretrial confinement." *United States v. Wilson*, 72 M.J. 347, 354 (C.A.A.F. 2013). His generalized claims that he experienced obstacles to getting allergy medication fall short of demonstrating particularized anxiety and concern. Finally, and most importantly, he has wholly failed to demonstrate that his defense may have been impaired. Appellant's defense team raised 18 motions at trial. Trial defense counsel was successful in getting 7 of the 17 referred specifications

dismissed. Appellant has pointed to no witness or evidence that became unavailable as a result of the delay. Our review of the record reveals a well-litigated case by trial defense counsel in the face of strong evidence by the prosecution. Appellant was ably represented by a team of counsel, and we reject Appellant's position that his defense was impaired because he experienced some difficulty personally researching issues and freely communicating with his counsel.[25]

## E. Balancing of Barker Factors in an Article 10, UCMJ, Context

Considering the fundamental command of Article 10, UCMJ, for reasonable diligence, and balancing the *Barker* factors, we conclude that Appellant was not denied his right to a speedy trial under Article 10, UCMJ. Although there were situations in which the Government might have been able to move more quickly, overall the Government demonstrated consistent progress toward bringing this case to trial, and it made a reasonable decision to await the results of the computer forensics examination. The record does not reveal that the forensic laboratory improperly prioritized or otherwise unreasonably delayed the forensic examination of the computer evidence, and when the Government realized that it could no longer afford to wait for the full results of the examination, it preferred charges.

Appellant has failed to demonstrate any prejudice as a result of the delay. It is apparent his defense team took full advantage of the delay by raising several motions that led to the dismissal of several charges and other relief. Even after Appellant was arraigned, trial did not take place for another 170 days to allow for the litigation of several defense motions and the resolution of the final composition of Appellant's defense team. We conclude that the Government proceeded to trial with reasonable diligence under the circumstances of this case, and the military judge did not err in concluding that Appellant was not denied his Article 10, UCMJ, right to a speedy trial.

## VI. Issue V: Admission of Testimony under Mil. R. Evid. 404(b)

Appellant met DP in about 1997 and married her in 2000. The couple divorced in 2003. DP had a son who lived with the couple during their marriage. DP's son was about 10 years old when the couple met and about 13 years old when Appellant and DP were married. The Government called DP to testify to certain aspects of their relationship. She testified that during their six years together they engaged in intimate kissing twice, both times being very awkward, and never had sexual intercourse. DP testified that she attempted to have intercourse with Appellant, but he rejected her advances. She also testified that Appellant seemed to be more interested in her son than her. DP testified that on one occasion she went into her son's room and found him straddling Appellant, who was lying on his back. When her son got off of Appellant, DP saw that Appellant had an

---

[25] Even if Appellant's defense was impaired by this lack of access, we fail to understand how the delay in bringing him to trial worsened this problem. If anything, granting him more time to conduct research and consult with counsel would seem to improve Appellant's ability to prepare for trial.

"extremely obvious" erection under his shorts, which he covered by quickly untucking his shirt. DP testified that when she left Appellant, he was devastated about her son leaving but had no reaction to her leaving.

At trial, the Defense raised a motion in limine to exclude DP's testimony on this matter. The Government responded that it was offering the testimony under Mil. R. Evid. 404(b) to aid in proving the specifications alleging the indecent acts toward the sibling of a "little brother," arguing that this is "clear, strong evidence that [Appellant], in fact, would have a sexual interest in a child, that this was something he was looking for."

The military judge denied the Defense's motion in limine. He found that the evidence reasonably supported a conclusion that Appellant committed the acts to which DP testified, and that the proffered evidence was "highly probative of whether [the] accused had *motive, intent, or plan* to engage in the alleged indecent acts involving [NR]." Finally, he found that DP's testimony survived a balancing test under Mil. R. Evid. 403, in that its probative value was not substantially outweighed by the danger of unfair prejudice; confusion of the issues; misleading the members; or considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Appellant challenges this ruling, asserting that the Government offered this evidence to show that Appellant was a sexual deviant and was attracted to young boys—an improper purpose under Mil. R. Evid. 404(b). Appellant argues that even if this evidence served a proper purpose under Mil. R. Evid. 404(b), it does not survive the Mil. R. Evid. 403 balancing test and, therefore, should have been suppressed.

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)). A decision to admit or exclude evidence based upon Mil. R. Evid. 403 is within the sound discretion of the military judge. *United States v. Smith*, 52 M.J. 337, 344 (C.A.A.F. 2000). However, "[w]here the military judge is required to do a balancing test under [Mil. R. Evid.] 403 and does not sufficiently articulate his balancing on the record, his evidentiary ruling will receive less deference . . . ." *United States v. Berry*, 61 M.J. 91, 96 (C.A.A.F. 2005).

Mil. R. Evid. 404(a) generally states that evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with that character or trait. However, Mil. R. Evid. 404(b) sets forth exceptions to that rule.

Under *United States v. Reynolds*, three standards are utilized to test the admissibility of evidence of uncharged misconduct under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that Appellant committed prior crimes, wrongs or acts?
>
> 2. What fact . . . of consequence is made more or less probable by the existence of this evidence?
>
> 3. Is the probative value . . . substantially outweighed by the danger of unfair prejudice?

29 M.J. 105, 109 (C.M.A. 1989) (quotation marks and citations omitted).

In *United States v. Morrison*, 52 M.J. 117 (C.A.A.F. 1999), the appellant was convicted of battery on a child under the age of 16 years and committing indecent acts. One of the victims was the daughter of a family friend; the other victim was the appellant's niece. *Id*. at 119. The military judge admitted Mil. R. Evid. 404(b) evidence that the appellant had sexually abused his daughter over an eight-year period. *Id*. at 120. The military judge found that the acts with his daughter were similar to those with the other two girls and, therefore, admissible to show motive, plan or scheme, ability or opportunity, and lack of mistake. *Id*. at 122. On appeal, our superior court found that the military judge abused his discretion. The court held that uncharged acts "must be almost identical to the charged acts" to be admissible as evidence of a plan or scheme. *Id.* (quoting *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984)). Likewise, "[w]here evidence is offered to show modus operandi, there must be a 'high degree of similarity between the extrinsic offense and the charged offense.' The similarity must be so great that it is 'like a signature marking the offense as the handiwork of the accused.'" *Id.* (quoting *United States v. Gamble*, 27 M.J. 298, 305 (C.M.A. 1988)).[26]

We find the military judge abused his discretion in admitting DP's testimony concerning Appellant's acts toward DP's son.

The admission of DP's testimony was erroneous under the second *Reynolds* prong. The trial judge, trial counsel, and appellate government counsel have all failed to articulate a fact of consequence that is made more or less probable by DP's testimony evidence. The military judge's written ruling relied on the rationale that the proffered evidence was probative of whether Appellant had motive, intent, or plan to engage in the charged indecent acts involving NR. Uncharged misconduct is only admissible if offered for some purpose other than to demonstrate that the accused is predisposed to such criminal activity. *United States v. Taylor*, 53 M.J. 195, 199 (C.A.A.F. 2000). We see no fact made more or

---

[26] Mil. R. Evid. 414 was enacted after *United States v. Morrison,* 52 M.J. 117 (C.A.A.F. 1999), and it provides guidance for determining the admissibility of evidence of similar crimes in child molestation cases. Trial counsel did not provide the required notice, and neither of the parties addressed the applicability of Mil R. Evid. 414. The military judge's ruling likewise did not address Mil. R. Evid. 414. Therefore, we do not address the potential admissibility of the evidence under Mil. R. Evid. 414.

less probable by DP's testimony, other than propensity. "[E]vidence of uncharged bad acts may not be introduced solely to show that the accused has a propensity to commit crimes of the type charged."[27] *Morrision*, 52 M.J. at 121. The only relevance to DP's testimony was to show that Appellant was the type of person who would commit the charged offenses. This is exactly what Mil. R. Evid. 404 prohibits.

Having determined that the military judge abused his discretion in admitting DP's testimony under Mil. R. Evid. 404(b), we must test for prejudice under Article 59(a), UCMJ, 10 U.S.C. 859(a). Our test in this regard is to "determine whether this error resulted in material prejudice to [the a]ppellant's substantial rights." *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006). "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

Under this standard, we find no material prejudice to a substantial right of Appellant from the military judge's erroneous admission of DP's testimony. The Government's case concerning the indecent acts toward the "little brother's" sibling was strong. The Government had photographic evidence of Appellant's acts taken from Appellant's computer. The photos themselves, combined with the computer forensic evidence and other evidence tying Appellant to the photos, convincingly demonstrated that Appellant committed the charged misconduct. The Defense case, conversely, essentially involved implying that somehow photos of the indecent acts must have come from some other source than Appellant, even though photos were taken during times when the victim was in Appellant's care. We recognize that the military judge erroneously found that DP's testimony was relevant, but the military judge's ruling offered no reason to believe he, as the factfinder, placed great value on this evidence. Under these circumstances, we are confident that the erroneous admission of DP's testimony had no impact on Appellant's conviction for the specifications of indecent acts.

Appellant raises one other issue regarding prejudice that bears discussion. After the military judge's ruling concerning DP's testimony, Appellant elected to be tried by a military judge alone. Trial defense counsel noted that Appellant's forum choice was based on the ruling regarding DP's testimony and one other evidentiary ruling. Appellant now alleges that he was prejudiced by the admission of DP's testimony, in part, because it affected his forum choice. Appellant cites no case law to indicate that a ruling that affects forum choice constitutes prejudice, in and of itself, and we find no authority for this position. Appellant presumably made his forum choice precisely to minimize the danger

---

[27] The word "bad" does not appear in Mil. R. Evid. 404(b). However, the rule is traditionally interpreted as referring to "bad acts" as part of the general prohibition against character evidence to show action in conformity therewith. *See, e.g., United States v. James*, 63 M.J. 217, 219 (C.A.A.F. 2006) ("The rule allowed evidence of *bad acts* to be admitted for limited purposes, but the basic evidentiary rule excluded *bad acts* solely to show bad character and a propensity to act in conformance with that bad character." (emphasis added)).

of prejudice resulting from the military judge's rulings, and electing to be tried by a military judge alone resulted in no cognizable harm to Appellant. If we accepted Appellant's position, an accused could convert every erroneous ruling into a basis for a new trial merely by stating that the ruling played into the choice of forum. We find that a ruling that affects forum choice does not, in and of itself, materially affect a substantial right of an accused.[28] Appellant was not prejudiced by the military judge's erroneous ruling admitting DP's testimony, and he is not entitled to relief on this issue.

### VII. Issue VI: Admission of Evidence under Mil. R. Evid. 413 and 414

Before trial, the Government provided the Defense notice that it intended to introduce evidence that Appellant had sexually molested another "little brother" about 20 years earlier. The former "little brother," JP, stated that Appellant showed him pornography and touched him inappropriately when JP was eight years old.[29] JP stated that this conduct continued after Appellant moved away, as JP continued to visit Appellant. JP further stated that Appellant's conduct progressed to attempts to have anal sex with him, and the conduct continued until JP was about 14 years old.

At trial, the Defense moved to exclude JP's testimony, asserting that it failed to qualify for admission under Mil. R. Evid. 413. The military judge disagreed, finding JP's testimony was relevant and its probative value was not substantially outweighed by its prejudicial effect. Appellant now alleges the military judge abused his discretion in admitting this testimony. We disagree.

As in the previous issue, we review the denial of a motion to suppress for an abuse of discretion. *United States v. Larson*, 66 M.J. 212, 215 (C.A.A.F. 2008).

Mil. R. Evid. 413(a) provides that "[i]n a court-martial in which the accused is charged with an offense of sexual assault, evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." Before admitting evidence under this rule, the military judge is required to find that (1) the accused is charged with an offense of sexual assault, (2) the evidence proffered is evidence of the accused's commission of another offense of sexual assault, and (3) the evidence is relevant under Mil. R. Evid. 401 and 402. *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000). In addition, under Mil. R. Evid. 403, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice or similar concerns. *Id.*

---

[28] Appellant also alleges prejudice because the military judge's erroneous ruling likely impacted the sentence adjudged. Our review of the record reveals no reason to believe the military judge used DP's testimony in determining Appellant's sentence.

[29] JP provided the initial report of child sexual abuse that led to the wider investigation into Appellant's activities. Appellant was not charged with any offense involving JP.

Mil. R. Evid. 414(a) sets forth a similar rule in a slightly different context. It states that "[i]n a court-martial in which the accused is charged with an offense of child molestation, evidence of the accused's commission of one or more offenses of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant." This rule, like Mil. R. Evid. 413, "establishes a presumption in favor of admissibility of evidence of prior similar crimes in order to show predisposition to commit the designated crimes." *United States v. Tanner*, 63 M.J. 445, 448 (C.A.A.F. 2006) (citing *Wright*, 53 M.J. at 482–83). Like Mil. R. Evid. 413, a military judge must perform a two-step analysis to determine the admissibility of evidence under Mil. R. Evid. 414. First, the military judge must make three threshold findings: (1) the accused is charged with an act of child molestation as defined by the rule, (2) the proffered evidence is evidence of his commission of another offense of child molestation as defined by the rule, and (3) the evidence is relevant under Mil. R. Evid. 401 and 402. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2008). If these three threshold factors are met, then the military judge must apply the balancing test of Mil. R. Evid. 403. *Id.*

In performing the Mil. R. Evid. 403 balancing test under either Mil. R. Evid. 413 or 414, a careful balancing must be performed due to "the potential for undue prejudice that is inevitably present when dealing with propensity evidence." *United States v. James*, 63 M.J. 217, 222 (C.A.A.F. 2006). Factors the military judge should consider include: (1) strength of proof of the prior act, for example, whether the proof represents a conviction or mere gossip; (2) probative weight of the evidence; (3) potential for less prejudicial evidence; (4) potential of distraction to the factfinder; (5) time needed for proof of the prior conduct; (6) temporal proximity between the charged misconduct and the prior act; (7) frequency of the acts; (8) presence or lack of intervening circumstances; and (9) relationship between the parties. *Wright*, 53 M.J. at 482.

As an initial matter, the record contains some confusion as to whether JP's testimony was offered under Mil. R. Evid. 413 or 414, or both. The record of trial does not contain the Government's notice to trial defense counsel, but both the Defense's motion and the Government's response refer only to Mil. R. Evid. 413. During motions practice, however, trial defense counsel noted that Mil. R. Evid. 414 was the more appropriate rule and asked the military judge to apply that rule. The military judge accordingly found the evidence admissible under both rules. On appeal, Appellant concedes that Mil. R. Evid. 414 is the more appropriate rule, but contends the analysis would be substantively identical under either rule.

We agree with Appellant that Mil. R. Evid. 414 is the more appropriate rule in this situation, and we choose to analyze this issue under that rule, recognizing that the military judge found the evidence admissible under either rule.[30] Having done so, we find no abuse

---

[30] Assuming this matter should be analyzed under Mil. R. Evid. 413, our conclusion would not change. Both the charged and prior actions constitute offenses of sexual assault, as defined by Mil. R. Evid. 413(d). Otherwise, our analysis under Mil. R. Evid. 413 would be identical to our analysis under Mil. R. Evid. 414.

of discretion in the military judge's ruling to admit JP's testimony. "Mil. R. Evid. 414 sets forth a two-part test to determine whether proposed "similar crimes" constitute "child molestation": (1) whether the conduct constitutes a punishable offense under the UCMJ, federal law, or state law when the conduct occurred; and (2) whether the conduct is encompassed within one of the specific categories set forth in Mil. R. Evid. 414(d)(2)" *United States v. Fetrow*, 75 M.J. 574, 582-83 (A.F. Ct. Crim. App. 2016) The first two factors (whether Appellant was charged with an act of child molestation and whether JP's testimony was evidence of his commission of another offense of child molestation) are easily met. As to the relevancy of this evidence, we agree with Appellant that the military judge's analysis of this threshold factor was cursory. However, we see no abuse of discretion in his ultimate conclusion that JP's testimony was relevant. Mil. R. Evid. 414 "reflects a presumption that other acts of child molestation constitute relevant evidence of predisposition to commit the charged offense." *Tanner*, 63 M.J. at 449. The Defense case was that the Government did not meet its burden of proving Appellant was the person pictured in the digital images found on Appellant's computer committing indecent acts upon the "little brother's" sibling. JP's testimony, showing Appellant's predisposition to commit sexual acts upon young boys in his care, was directly relevant to the charged indecent acts.

We also find no abuse of discretion in the military judge's ruling that JP's testimony was admissible under the Mil. R. Evid. 403 balancing test. The military judge listed all the relevant *Wright* factors that impacted his balancing test. We recognize that the military judge did not spell out his weighing of these factors, but instead summarily found that the probative value of JP's testimony was not substantially outweighed by the danger of unfair prejudice. *See United States v. Dewrell*, 55 M.J. 131, 138 (C.A.A.F. 2001) (noting that a military judge is not required to make detailed findings of fact under Mil. R. Evid. 403, but must, nevertheless, fully evaluate the evidence and make a clear record of the reasoning behind its findings). We conclude the military judge adequately explained his reasoning.

Even if we give the military judge's ruling less deference based on the failure to thoroughly spell out his application of the *Wright* factors, we still concur with his conclusion. Applying the *Wright* factors on our own, we also find that the probative value of JP's testimony was not outweighed by the danger of unfair prejudice.

Strength of proof of the prior act. JP's testimony reflected direct and detailed evidence from the victim of Appellant's prior acts.

Probative weight of the evidence. JP's testimony demonstrated Appellant's predisposition to commit sexual acts toward young boys in his care, a fact that directly helped prove the charged indecent acts. Appellant asserts that the two acts were sufficiently different to render the earlier acts less probative because Appellant took pictures in the charged acts and there is no evidence he took pictures in the prior acts. We disagree that the absence of photos renders the earlier acts any less probative.

Potential for less prejudicial evidence.  We see no less prejudicial evidence that could be admitted to prove Appellant's prior acts.

Potential distraction to the factfinder and time needed for proof of the prior conduct. Particularly in a military-judge alone trial, calling one witness to establish Appellant's prior acts did not distract the factfinder or add greatly to the time involved.

Temporal proximity between the charged misconduct and the prior act.  We recognize the two acts were separated by about 14 years.  However, this one factor does not outweigh the remaining factors.

Frequency of the acts.  JP's testimony revealed Appellant engaged in sexual acts with him often over a period of several years.

Presence or lack of intervening circumstances.  Appellant underwent normal military reassignments in between the prior acts and the charged misconduct, but otherwise, no specific intervening circumstances are apparent.

Relationship between the parties.  No relationship between JP and the victim of the charged misconduct was apparent.

Even if we were to grant the military judge less deference, our own weighing of these factors convinces us that JP's testimony survives the Mil. R. Evid. 403 balancing test. We find no abuse of discretion in the admission of this evidence.

*VIII. Issue VII:  Legal and Factual Sufficiency—Possession of Child Pornography*

Appellant contends his conviction for possessing child pornography is legally and factually insufficient in two respects:  (1) the evidence did not definitively establish that Appellant possessed the charged material within the continental United States, as charged; and (2) the evidence does not support a finding that Appellant knowingly possessed the material during the charged time frame.  We disagree.

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we review issues of legal and factual sufficiency de novo. *United States v. Lane*, 64 M.J. 1, 4 (C.A.A.F. 2006).  Article 66(c), UCMJ, requires that we approve only those findings of guilty that we determine to be correct in both law and fact.  The test for legal sufficiency is whether, when the evidence is viewed in the light most favorable to the government, a reasonable factfinder could have found Appellant guilty of all elements of the offense, beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. Review of the evidence is limited to the entire record, which includes only the evidence admitted at trial and exposed to the crucible of cross-examination. Article 66(c), UCMJ; *United States v. Bethea*, 46 C.M.R. 223, 224–25 (C.M.A. 1973).

The charge and specification that formed the basis for Appellant's conviction for possessing child pornography reads as follows:

> That [Appellant] did, within the continental United States, between on or about 2 July 2007 and on or about 12 March 2012, wrongfully and knowingly possess more than one digital image of minors engaging in sexually explicit conduct, which conduct was prejudicial to good order and discipline and of a nature to bring discredit upon the armed forces.

The Government only charged Appellant with possessing a small number of images of child pornography found on his computer media devices. The Government successfully admitted many other such images found on Appellant's devices under Mil. R. Evid. 404(b), to show purposes such as intent, knowledge, and absence of mistake or accident. The Government also introduced evidence that Appellant's computer media devices contained stories about sexual interactions between men and boys, as well as Internet search terms indicative of child pornography.

During its case-in-chief, the Government called the examiner who analyzed Appellant's computer media to testify about the external computer hard drive on which the charged images were found. The examiner testified that the external hard drive was first formatted on 11 March 2011. He testified the charged images were recovered as "thumbnail" images from this external hard drive, and that the external hard drive was used to back up Appellant's laptop computer. He testified that the charged images were backed up to the external hard drive on 22 October 2011, from Appellant's laptop. The examiner testified that the thumbnail images found on the external hard drive, and the fact that these thumbnail images were backed up from the laptop, indicated that Appellant viewed the images on the laptop. The charged images were not found on the laptop itself, but the Government introduced evidence that Appellant purchased this laptop in either February or April 2010.[31] The examiner also testified that the operating system on the laptop was installed in April 2010. The external hard drive on which the charged images were found was found in Appellant's home on 12 March 2012.

Appellant first contends that the evidence did not demonstrate that the offense occurred within the continental United States. He asserts that the Government did not

---

[31] The evidence indicates Appellant ordered the computer in February 2010 but was not billed for it until April 2010.

definitively establish the dates during which the possession occurred, the Government did not present evidence that Appellant was actually in the continental United States on these dates, and evidence in the record indicates Appellant was out of the country for at least six months during the charged time frame. We reject Appellant's argument and find the conviction for possessing child pornography legally and factually sufficient.

While the charged time frame reached back to 2 July 2007, the evidence at trial convincingly demonstrated Appellant possessed the images in question on his laptop, and he did not purchase the laptop until February or April 2010. Appellant's performance reports and other personnel documents in the record of trial indicate he was stationed in the continental United States from early 2010 through March 2012. Additionally, even if he might have been out of the country for brief periods during this time, we have no trouble concluding that he continued to possess the charged images when he returned to the United States, as they remained on his laptop until at least such time when he backed up the laptop's contents to his external hard drive. There, the images remained until the external hard drive was seized in March 2012. Appellant's possession of child pornography took place in the continental United States.

Appellant's second attack on the sufficiency of his conviction centers on his contention that he did not *knowingly* possess the material. He focuses on testimony by the computer forensic examiner that the images made their way from Appellant's laptop to the external hard drive "by accident," and that the thumbnail images were found in the external hard drive's unallocated space. He asserts that this evidence indicates that the charged images may have resided on the laptop and the external hard drive without his knowledge. He also notes that the charged images were not found on the laptop itself, which he argues further supports a theory that he did not knowingly possess the charged images. Finally, he notes that the charged images were "thumbnail" images; he asserts this shows that the images may have resided on the laptop without his knowledge.

We disagree with Appellant's contention that the evidence did not prove he knowingly possessed the charged images. Regardless of whether Appellant knew the images resided on his external hard drive, he knew they resided on his laptop after he purchased it in February or April 2010. The examiner's testimony indicates that the thumbnail images appeared in the cache on Appellant's computer devices because at one point Appellant opened the images to view them and later deleted them. The uncharged images admitted under Mil. R. Evid. 404(b), the stories found on Appellant's computer, and the search terms Appellant used to search for child pornography convince us that the images did not appear on Appellant's laptop without his knowledge. Viewed in the light most favorable to the Government, a reasonable factfinder could have found Appellant guilty of all elements of this offense beyond a reasonable doubt. Similarly, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

*IX. Issue VIII: Lawfulness of No-Contact Orders*

Appellant challenges the lawfulness of the first no-contact order he was convicted of violating. He raises four bases for this challenge: (1) the order served no valid military purpose, (2) the order was overly broad, (3) the order conflicted with Appellant's constitutional and statutory rights against compulsory self-incrimination, and (4) the order unconstitutionally restricted his rights to self-representation and access to witnesses under the Sixth Amendment. We disagree.

We review de novo the lawfulness of a military order. *United States v. New*, 55 M.J. 95, 106 (C.A.A.F. 2001). The critical "attributes of a lawful order include: (1) issuance by competent authority—a person authorized by applicable law to give such an order; (2) communication of words that express a specific mandate to do or not do a specific act; and (3) relationship of the mandate to a military duty." *United States v. Deisher*, 61 M.J. 313, 317 (C.A.A.F. 2005). Orders are presumed to be lawful, and Appellant bears the burden of demonstrating otherwise. *New*, 55 M.J. at 106; *United States v. Hughley*, 46 M.J. 152, 154 (C.A.A.F. 1997). Thus, "a subordinate disobeys an order at his own peril," though they may challenge the lawfulness of the order when it is given or in later proceedings. *United States v. Kisala*, 64 M.J. 50, 52 (C.A.A.F. 2006).

The no-contact order at issue was given by the commander of the Air Force Legal Operations Agency (AFLOA) on 24 June 2011, about two months after the initial report to AFOSI of an allegation of child sexual abuse against Appellant. In the interim, AFOSI had interviewed at least three former "little brothers" of Appellant, but none claimed Appellant did anything improper. The no-contact order read, in its entirety, as follows:

> 1.  The Air Force Office of Special Investigations is investigating certain criminal misconduct allegedly committed by you. Both for your own protection and to safeguard the integrity of the ongoing investigation, you are hereby ordered to refrain from initiating any contact and/or communication with any person whom you know to be associated with "Big Brothers Big Sisters," or whom you know to be associated with any mentoring program for minors under age 18, for which you are or were a volunteer or employee. This no-contact order prohibits your communication with "Big Brothers Big Sisters" or similar youth organization employees, volunteers, and staff, and with any child you have mentored or are currently mentoring, regardless of current age, including with his or her family members.
>
> 2.  This order prohibits all forms of oral or written communication, personally or through a third party, including

face-to-face contact, telephone, letter, data fax, electronic mail, text message, instant message, social networking website, other website, or chat room communications. If anyone described in paragraph 1 initiates any contact or communication with you, you must immediately cease the communication and notify me of the facts and circumstances surrounding such contact. You shall remain at all times and places at least 500 feet away from anyone described in paragraph 1 wherever located, including, but not limited to, residences, workplaces, and previously used or known organization meeting locations.

3. This order will remain in effect for 90 days beginning with your receipt of the order, unless earlier terminated. If you believe a valid reason exists to modify this order, you may contact me in writing to seek modification or termination of the order. Should you have any questions regarding the terms and conditions of this order, you must contact me in writing with your inquiry. Violation of this order will result in disciplinary action.

Appellant acknowledged receipt and understanding of this order.[32]

On 19 July 2011, Appellant's commander issued a "supplemental clarification" of the earlier no-contact order, at the request of Appellant's trial defense counsel. The supplemental order clarified Appellant's requirements if anyone covered by the no-contact order contacted him as follows: "If anyone described in paragraph 1 of the Order initiates any contact or communication with you, you must immediately cease the contact or communication and notify me, in writing, of the date, time and name of person initiating the contact or communication. No other information is required." The supplemental order stated it was to remain in effect until 22 September 2011, unless earlier terminated. Appellant again acknowledged receipt and understanding of the supplemental order. The order was later amended to run through 20 December 2011.

On 6 January 2012, more than two weeks after the series of no-contact orders expired, Appellant's commander extended the no-contact order through 5 May 2012. This extension did not alter the terms of the original order and its supplemental clarification, other than by extending their length. This order averred that the earlier orders were being extended because AFOSI had not completed its investigation into Appellant's alleged misconduct.

---

[32] The person who served the order on Appellant later informed Appellant that if someone covered by the no-contact order contacted him, Appellant was permitted to inform that person that there was a no-contact order in place and that he could not speak to the person.

Appellant was convicted of violating this series of no-contact orders with three different people from late 2011 though early 2012.

Appellant's first challenge to this series of no-contact orders focuses on the purpose of the orders—for Appellant's protection and to safeguard the integrity of the ongoing investigation. Appellant contends that the original order was issued solely on the basis of an allegation of misconduct about 14 years earlier, before Appellant entered the Air Force. He also states that at the time the initial order was issued, there was no evidence Appellant had attempted to obstruct or impede the investigation. Finally, he asserts that the order prohibited contact not only with children Appellant had been involved with in the BBBS program, but also their family members and BBBS staff members, indicating there was no military purpose for such a broad prohibition.

The military judge denied a motion to dismiss the specifications alleging violations of these orders, finding the orders were lawful. Finding that the orders had a valid military purpose, he ruled, "Protecting civilians from injury at the hands of military members, and preventing tampering with witnesses and evidence, are valid military purposes. [T]he orders given the accused were designed to accomplish those purposes."

Like the military judge, we find the series of no-contact orders served valid military purposes. The initial order articulated two valid military purposes: (1) to protect Appellant (presumably from allegations of further misconduct), and (2) to safeguard the integrity of the ongoing investigation. Protecting servicemembers from themselves and protecting others from servicemembers are both equally valid military purposes for a no-contact order. *United States v. Padgett*, 48 M.J. 273, 278 (C.A.A.F. 1998). Protecting the integrity of an ongoing criminal investigation is also a legitimate purpose of a no-contact order as it furthers the military's interest in resolving allegations of criminal conduct by its members. There may not have been evidence at the time the initial no-contact order was issued that Appellant had actually tried to obstruct or impede the investigation, but this is not required. "There is no requirement in the law that a commander determine whether improper conduct has occurred before prohibiting it and no requirement that a commander determine that a member of the command intends to commit an improper act before prohibiting it." *Id.* It is true that at the time of the initial no-contact order, the only allegation was by a former "little brother" of misconduct that took place about 14 years earlier. Nonetheless, AFOSI learned early in its investigation that Appellant had extensive involvement in the BBBS program and that he had recently been disenrolled for violations of the program's rules regarding contact with minors. Appellant's commander was faced with a situation that required extensive investigation to determine the breadth and depth of Appellant's possible misconduct. As the investigation proceeded, additional misconduct came to light, requiring extensions of the initial order. Under these circumstances, we have no trouble concluding that the commander possessed a valid military purpose for issuing the series of no-contact orders.

Appellant next argues that the initial order, as clarified and extended, was overly broad in two ways: (1) the orders prohibited all communication, rather than communication that might intimidate or influence any person connected with the investigation; and (2) the series of orders restricted access to people such as family members of BBBS children and BBBS staff members, while Appellant's commander had no reason to believe communication with these people might have affected the investigation. We reject this argument. Appellant's misconduct caused the Air Force to conduct a lengthy, detailed investigation. Until the extent of Appellant's misconduct was known, the Air Force had a legitimate reason to issue a broad order prohibiting communication with anyone associated with BBBS or similar mentoring programs. The series of orders prohibited contact with a specific class of people tied directly to the scope of AFOSI's investigation. This is, therefore, unlike the order Appellant cites to from *United States v. Wysong*, 26 C.M.R. 29, 31 (C.M.A. 1959), which "sought to place the accused in a tight vacuum completely sealed off from all normal communicative exchange with those with whom he would be most likely to converse." We, likewise, see no problem with the prohibition against all communication with these individuals, rather than merely prohibiting communication about the investigation. Under the circumstances, prohibiting all communication with these individuals (many of whom Appellant no longer formally mentored through the BBBS program) was not overly broad in scope, nor did it impose an unjust limitation on Appellant's personal rights. This is particularly true given that Appellant was not convicted for a one-time, inadvertent violation of the orders, but of repeated, long-term violations with several people. *Cf. United States v. Moore*, 58 M.J. 466, 468 (C.A.A.F. 2003) (holding that a standing order prohibiting unnecessary association by military personnel with civilian employees was not overbroad given the context in which the order was issued and the manner in which it was violated); *United States v. Womack*, 29 M.J. 88, 91 (C.M.A. 1989) (determining that an order to practice safe sex with all partners, including civilians, was not overly broad).

Appellant's third attack on the series of no-contact orders is that his constitutional and statutory rights against compulsory self-incrimination were violated. He asserts that the initial order, as modified, required him to disclose the name of any person initiating contact with him, as well as the date and time of that contact. He states he continued to engage in communication with three individuals who contacted him, and by requiring him to disclose the contacts by these people, "it [was] reasonable for [Appellant] to believe that if he disclosed the required information, that disclosure would have been used by investigators and would have led to the discovery of incriminating information."

We find no concern that the order, as amended, violated Appellant's constitutional or statutory rights against compulsory self-incrimination. The Fifth Amendment and Article 31(a), UCMJ, 10 U.S.C. § 831(a), prohibit the government from compelling a servicemember to incriminate themselves. However, not every situation in which the government requires a servicemember to divulge potentially incriminating information violates the member's constitutional or statutory rights. In *United States v. Heyward*, 22

M.J. 35 (C.M.A. 1986), the accused challenged an Air Force regulation imposing a requirement to report drug use by others. The accused asserted that his conviction for dereliction of duty resulting from his violations of this regulation violated his privilege against compulsory self-incrimination. Our superior court disagreed. The court noted that the regulation did not require the accused to report his illegal acts, and the mere possibility that information the accused might disclose could focus investigators' attention on the reporting servicemember was insufficient to invalidate the reporting requirement. *Id.* at 37. *See also United States v. Medley*, 33 M.J. 75 (C.M.A. 1991) (holding a dereliction of duty conviction did not violate the right against compulsory self-incrimination, even though the accused joined, on other occasions, the criminal acts of those she reported).

We recognize that this case differs from the general regulation at issue in *Heyward*. Here, Appellant's commander issued a specific order toward a person already suspected of misconduct; whereas in *Heyward*, the regulation was "not aimed at a particular group suspected of criminal activity, but instead applie[d] equally to all Air Force members who know of drug abuse by others." *Heyward*, 22 C.M.R. at 37. However, this concern is greatly obviated by the fact that the record contains no evidence Appellant actually made disclosures pursuant to these no-contact orders, and he was not charged with dereliction of duty or disobeying an order for failing to do so. *See United States v. Castillo*, 74 M.J. 160 (C.A.A.F. 2015) (finding no basis for a facial Fifth Amendment challenge to Navy regulations based on hypothetical constitutional questions). Instead, Appellant was merely charged with violating the terms of the no-contact orders by either contacting people covered by the orders or for continuing to engage in communication with them after being contacted. Appellant has not shown that he provided incriminating evidence pursuant to the disclosure requirement. The "mere possibility" that compliance with the disclosure requirement might have led to some incriminating information is an insufficient basis to find the orders unlawful, as no criminal liability resulted from the disclosure requirement. *See United States v. Williams*, 27 M.J. 710, 716 (A.C.M.R. 1988) (observing that the Fifth Amendment protects "the right not to be criminally liable for one's previous failure to obey a statute which requires an incriminatory act") (quoting *Leary v. United States*, 395 U.S. 6, 28 (1969)).

Finally, Appellant alleges that the order unconstitutionally restricted his rights to self-representation and access to witnesses, as guaranteed by the Sixth Amendment. He notes he was representing himself in criminal proceedings by the State of Florida on charges of traveling to meet a minor for purposes of engaging in sexual activity. Because of this, he asserts, the no-contact orders unlawfully denied him access to potential witnesses relevant to the state proceedings. We reject this argument.

The Sixth Amendment guarantees the right to represent one's self in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 836 (1975). The Sixth Amendment also provides a person charged with a criminal offense the right to compulsory process to obtain defense witnesses. *Taylor v. Illinois*, 484 U.S. 400, 408–09 (1988).

We find the series of no-contact orders did not impose an "unjust limitation" on Appellant's Sixth Amendment rights to represent himself in state proceedings or to obtain access to defense witnesses in the state proceedings. *United States v. Wartsbaugh*, 45 C.M.R. 309, 314 (C.M.A. 1972). Appellant failed to demonstrate at trial any actual limitation on his ability to represent himself or to interview potential defense witnesses in the state proceedings against him. *See United States v. Nieves*, 44 M.J. 96, 99 (C.A.A.F. 1996) (declining to find an order prohibiting discussions with witnesses unlawful, in part because there was "no evidence that appellant ever requested permission to interview [a witness] or that such permission was denied"). We, therefore, decline to find the order unlawful based on theoretical or hypothetical limitations the order might have placed on his Sixth Amendment rights. *Womack*, 29 M.J. at 91. Additionally, at the time the initial no-contact order was issued, no state criminal proceedings had been initiated against Appellant. While state charges were later brought, the last extension in this series of no-contact orders expired on 5 May 2012, and Appellant has not alleged that the state proceedings required him to interview witnesses or otherwise prepare for trial before the final extension expired. In fact, our review of the record reveals it is extremely unlikely that Appellant required access to any potential witnesses for the state proceedings before 5 May 2012. Finally, the record reveals that Appellant's defense counsel in the court-martial were repeatedly able to interview potential witnesses in the state criminal proceedings. There is no reason Appellant could not have used information learned in those interviews to prepare for the state proceedings.

In summary, the series of no-contact orders served valid military purposes, was not overly broad, did not conflict with Appellant's constitutional and statutory rights against compulsory self-incrimination, and did not impermissibly curtail Appellant's Sixth Amendment rights to self-representation and access to witnesses. The series of orders was reasonably drawn to allow AFOSI to investigate Appellant's suspected misconduct without the risk of interference from Appellant and to protect Appellant. Appellant has not met his burden of demonstrating the series of orders was unlawful.

## X. Issue IX: Lawfulness of Additional No-Contact Order

On 10 November 2011, while the series of no-contact orders discussed above was in effect, Appellant's commander issued an additional no-contact order. This order was directed solely at Appellant's contact with AP, as AP had just provided a statement that he and Appellant had engaged in a sexual relationship. This order directed Appellant to refrain from "contacting and/or communicating with" AP through a variety of means. It also required that if AP initiated contact with Appellant, Appellant must immediately cease communication with AP and notify the commander of the facts and circumstances surrounding such contact. Appellant promptly violated this order by communicating with AP, and he continued to violate the order over a prolonged period until he was caught in a car with AP, leading to his placement in pretrial confinement.

Appellant now alleges that the 10 November 2011 no-contact order was unlawful based on the same alleged deficiencies as those discussed immediately above. We summarily reject Appellant's argument based on the legal framework and analysis discussed above. Valid military purposes existed for the order, as AP had just stated he and Appellant had been engaged in a prolonged sexual relationship. The fact that AP later recanted his statement under suspicious circumstances does not alter the fact that this matter needed to be investigated free of interference by Appellant. The no-contact order was not overbroad under the analysis above, particularly because it only related to Appellant's contact with one person. The order's requirement to report any contact by AP does not violate Appellant's right to be free from compulsory self-incrimination. Again, there is no evidence Appellant ever reported contact with AP, and he was not charged with violating this provision of the order. Finally, the order did not impermissibly impact his ability to interview witnesses and prepare for his defense in state proceedings. We see no reasonable possibility based on the record that Appellant had a valid need to interview AP before the no-contact order expired. Appellant is not entitled to relief under this assignment of error.

## XI. Issues X and XXVI: Unreasonable Multiplication of Charges and Ineffective Assistance of Counsel

Appellant's next assignment of error alleges that two specifications of committing an indecent act with a male under 16 years of age constituted an unreasonable multiplication of charges for both findings and sentencing purposes.[33] The first of the specifications alleged that Appellant placed his fingers on the buttocks of the sibling of one of Appellant's "little brothers" on or about 10 June 2005. The second of the specifications alleged that he placed his fingers on the same child's penis on the same date. Appellant argues that because the evidence indicated the two actions occurred within a short time of each other, the military judge should have merged the two specifications for findings and sentencing purposes. He also notes that the Article 32, UCMJ, investigating officer raised the issue of unreasonable multiplication of charges and suggests the Government's failure to resolve this issue in Appellant's favor constitutes evidence of prosecutorial overreaching. We disagree.

"A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion." *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012). Courts may apply the doctrine of unreasonable multiplication of charges to dismiss certain charges and specifications. R.C.M. 307(c)(4) summarizes this principle as follows: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The principle provides that the government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994). Our superior court has endorsed the following

---

[33] Appellant does not allege that these two specifications constitute multiplicious charging in violation of the double jeopardy clause of the Constitution.

non-exhaustive list of factors to consider in determining whether unreasonable multiplication of charges has occurred:

> (1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?;

> (2) Is each charge and specification aimed at distinctly separate criminal acts?;

> (3) Does the number of charges and specifications misrepresent or exaggerate Appellant's criminality?;

> (4) Does the number of charges and specifications [unreasonably] increase Appellant's punitive exposure?; and

> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F. 2001) (quoting *United States v. Quiroz*, 53 M.J. 600, 607 (N.M. Ct. Crim. App. 2000)) (line breaks added and quotation marks omitted). "[U]nlike multiplicity—where an offense found multiplicious for findings is necessarily multiplicious for sentencing—the concept of unreasonable multiplication of charges may apply differently to findings than to sentencing." *Campbell*, 71 M.J. at 23. In a case where the *Quiroz* factors indicate unreasonable multiplication of charges principles affect sentencing more than findings, "the nature of the harm requires a remedy that focuses more appropriately on punishment than on findings." *Quiroz*, 55 M.J. at 339.

Applying the *Quiroz* factors, we find these two specifications do not represent an unreasonable multiplication of charges. Appellant inappropriately touched the child in two distinct ways. These two actions might have been separated by a short period of time, but they were still separated. Thus, Appellant's misconduct involved two distinctly separate criminal acts, and charging them separately did not misrepresent his criminality. Charging these actions under two separate specifications increased Appellant's punitive exposure, but not unreasonably so, particularly in a case where the findings resulted in a maximum punishment to confinement of 47 years. We also find no evidence of prosecutorial overreaching or abuse in the drafting of the charges. The mere fact that the Article 32, UCMJ, investigating officer recommended merging the two specifications causes no inference of prosecutorial overreaching or abuse. Rather, this represents a situation where the convening authority and staff judge advocate reasonably disagreed with the investigating officer's recommendation. The two specifications do not represent an unreasonable multiplication of charges.

Appellant's *Grostefon* claim of ineffective assistance of counsel on this issue alleges that his trial defense counsel should have moved for relief on this issue at trial. He alleges that because they did not do so, his chances of prevailing on this issue on appeal are diminished because the first *Quiroz* factor asks whether Appellant objected at trial. We find no ineffective assistance of counsel for at least two reasons. First, for the reasons discussed above, there was no unreasonable multiplication of charges, and thus no reason for his trial defense counsel to move for relief and no prejudice resulted from their failure to do so. Second, our resolution of this issue does not rest on the first *Quiroz* factor. Even if Appellant had objected at trial, the remaining *Quiroz* factors would cause us to find no unreasonable multiplication of charges existed. Appellant was not denied effective assistance of counsel.

## XII. Issue XI: Imposition of Pretrial Confinement

As noted above, Appellant was placed in pretrial confinement in March 2012, after he was found in a car with AP in violation of a no-contact order. Within 48 hours of imposition of pretrial confinement, the required probable cause determination was completed by the AFLOA commander. R.C.M. 305(i)(1). Within seven days of imposition of pretrial confinement, the required review of pretrial confinement was conducted by a lieutenant colonel who was a subordinate of the general officer who ordered Appellant into pretrial confinement. R.C.M. 305(i)(2). Appellant argued at trial that neither official was neutral and detached, as required under the Rules for Courts-Martial. The military judge disagreed, and so do we.

We review a military judge's ruling on the legality of pretrial confinement for abuse of discretion. *United States v. Wardle*, 58 M.J. 156, 157 (C.A.A.F. 2003). "There is an abuse of discretion when a military judge applies an erroneous view of the law." *Id.*

R.C.M. 305(d) states that no person may be ordered into pretrial confinement except when there is a reasonable belief that an offense triable by court-martial has been committed, the person confined committed it, and confinement is required by the circumstances. R.C.M. 305(i) requires neutral and detached officers to conduct two reviews of this probable cause determination to support continued pretrial confinement. R.C.M. 305(k) provides that the remedy for noncompliance with R.C.M. 305(i) "shall be an administrative credit against the sentence adjudged for any confinement served as the result of such noncompliance."

The requirement for prompt review by a neutral and detached officer supports the Fourth Amendment's right of the people to be secure in their persons against unreasonable seizures. *County of Riverside v. McLaughlin*, 500 U.S. 44, 60 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 112–13 (1975); *United States v. Rexroat*, 38 M.J. 292, 294 (C.M.A. 1993); *Courtney v. Williams*, 1 M.J. 267, 270–71 (C.M.A. 1976). An officer is not neutral and detached when he or she becomes too directly involved with law enforcement such that the officer cannot perform his or her duties with a judicial attitude rather than a law

enforcement attitude. *United States v. Ezell*, 6 M.J. 307, 315 (C.M.A. 1979); *United States v. Redlinski*, 56 M.J. 508, 512 (C.G. Ct. Crim. App. 2001), *rev'd in part on other grounds*, 58 M.J. 117 (C.A.A.F. 2003).

We find no abuse of discretion in the military judge's findings that both reviews were conducted by neutral and detached officers. With respect to the 48-hour review conducted by the AFLOA commander, commanders are not per se unqualified to act as neutral and detached reviewers. *Rexroat*, 38 M.J. at 296. The only reasons Appellant articulates that this particular commander was not neutral and detached are that the commander issued the no-contact orders Appellant was accused of violating, and the commander was the subject of an Article 138, UCMJ, 10 U.S.C. § 938, complaint by Appellant regarding the no-contact orders. However, the no-contact orders formed only part of the alleged misconduct by Appellant. We see nothing about the violations of the no-contact orders or the Article 138, UCMJ, complaint that would cause any concern that the AFLOA commander would be so personally offended that she would lose the ability to perform her quasi-judicial role in this matter. Likewise, Appellant points to no statements or particular actions by the commander indicating a loss of objectivity. The military judge committed no error of law in his finding on this matter, and we find no abuse of discretion.

With regard to the lieutenant colonel conducting the seven-day review, the only evidence Appellant cites to indicate the reviewer was not neutral and detached is the fact that the reviewer was directly rated by the commander that ordered Appellant into pretrial confinement. We decline to create a per se rule that a person in such a situation is not neutral and detached. We see nothing in the reviewer's report to indicate he was anything less than conscientious in exercising his independent judgment.[34] In addition, there is no evidence that the general officer who ordered Appellant into pretrial confinement possessed some personal stake in the outcome of the reviewer's decision. We see no reason to believe the reviewer was not neutral and detached. The military judge applied the correct legal analysis to this issue at trial, and we find no abuse of discretion in his ruling.

### XIII. Issues XII and XXX: Maximum Punishment—Possession of Child Pornography

Appellant next contends that the military judge erred in determining the maximum punishment for Appellant's conviction of possessing child pornography under Charge I, Specification 1. As he did at trial, Appellant contends that the maximum punishment to confinement for this offense should have been confinement for 4 months rather than the 10 years the military judge determined. We disagree.

---

[34] Appellant cites to one line of the reviewer's report in which he quoted language from the 48-hour memorandum without changing the language out of the first person. We are not concerned that the reviewer was acting as a "rubber stamp" from this one matter.

"The maximum punishment authorized for an offense is a question of law, which we review de novo." *United States v. Beaty*, 70 M.J. 39, 41 (C.A.A.F. 2011).

Appellant was charged with wrongfully and knowingly possessing more than one digital image of minors engaging in sexually explicit conduct under Article 134, UCMJ. In response to a bill of particulars, the Government did not indicate whether the charged images merely appeared to be minors or were actually verified to be minors. Therefore, relying on *Beaty*, trial defense counsel argued that the maximum punishment provided for in 18 U.S.C. § 2252A did not apply because the specification failed to allege that the children in the images were *actual* minors. Instead, trial defense counsel asserted, the most closely analogous offense to be used for determining the maximum punishment was a simple disorder, carrying with it a maximum sentence to confinement of 4 months. The military judge ruled against Appellant, and Appellant renews this argument on appeal.

Consistent with *Beaty* and *United States v. Finch*, 73 M.J. 144, 148 (C.A.A.F. 2014), when all the elements of a federal crime, except the jurisdictional element, are included in a Clause 1 or 2, Article 134, UCMJ, specification, the analogous federal statute provides the maximum punishment. *Id*. at 147–48 (quoting *United States v. Leonard*, 64 M.J. 381, 384 (C.A.A.F. 2007)); *see also* R.C.M. 1003(c)(1)(B)(ii) (providing that an offense not listed in or closely related to one listed in the *Manual* is punishable as authorized by the United States Code).

Unlike the specification in *Beaty*, the specification here did not allege that the images were of only "what appears to be" minors. Moreover, *Beaty* reaffirmed that it was not an abuse of discretion to use the analogous United States Code maximum for a specification alleging possession of "visual depictions of minors engaging in sexually explicit activity." *Beaty*, 70 M.J. at 42. The specification here used substantially identical language to that approved in *Beaty*. Therefore, the charged crime here is punishable as authorized by the United States Code provision criminalizing possession of "child pornography," which carries a maximum sentence to confinement of 10 years. The term "child pornography" includes any visual depiction of sexually explicit conduct where (1) the visual depiction involves "the use of *a minor* engaging in sexually explicit conduct" or (2) the "visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of *a minor* engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A), (B) (emphasis added). Consistent with this definition of child pornography, the specification alleges the wrongful and knowing possession of video and photographic visual depictions of "minors" engaging in sexually explicit conduct. Therefore, the military judge correctly used the punishment authorized for possession of child pornography under 18 U.S.C. § 2252A(a)(5) for purposes of determining the maximum punishment.

We have also examined Appellant's *Grostefon* submission regarding this issue, which focuses on the language used in the Government's response to the bill of particulars.

We see nothing in the Government's response to the bill of particulars that indicates that the Government's theory was anything other than that Appellant possessed digital images of actual minors.

*XIV. Issue XIII: Completeness of Record of Trial*

Appellant alleges the record of trial is not substantially complete because it fails to contain his motion in limine filed at trial to exclude DP's testimony under Mil. R. Evid. 404(b). Therefore, he asserts, this court should approve a sentence that does not exceed that set forth in Article 54(c)(1)(B), UCMJ, 10 U.S.C. § 854(c)(1)(B). We disagree.

The transcript of Appellant's court-martial indicates the Defense filed a written motion to exclude DP's testimony. However, the record does not indicate that this motion was ever marked as an exhibit, and the record of trial contains no such motion.

"Whether a record is complete and a transcript is verbatim are questions of law that [we review] de novo." *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2013). Article 54(c)(1), UCMJ, requires a "complete record of the proceedings and testimony" to be produced in every "general court-martial in which the sentence adjudged includes death, a dismissal, a discharge, or (if the sentence adjudged does not include a discharge), any other punishment which exceeds that which may otherwise be adjudged by a special court-martial." The parties agree this requirement applies to Appellant's case. They also agree that trial defense counsel apparently filed a motion in limine to exclude DP's testimony, and that this motion is absent from the record of trial. They disagree as to the effect of this omission.

A "complete" record must include the exhibits that were received in evidence, along with any appellate exhibits. R.C.M. 1103(b)(2)(D)(v). In assessing whether a record is complete, the threshold question is "whether the omitted material is substantial, either qualitatively or quantitatively." *Davenport*, 73 M.J. at 377 (quoting *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982) (quotation marks omitted)). A substantial omission from the record of trial renders it incomplete; conversely, an insubstantial omission does not render a record of trial incomplete. *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000). "[O]missions are qualitatively substantial if the substance of the omitted material 'related directly to the sufficiency of the Government's evidence on the merits' and 'the testimony could not ordinarily have been recalled with any degree of fidelity.'" *Davenport*, 73 M.J. at 377 (quoting *Lashley*, 14 M.J. at 9). "Omissions are quantitatively substantial unless 'the totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness.'" *Id.* (quoting *United States v. Nelson*, 13 C.M.R. 38, 43 (C.M.A. 1953)).

Failure to produce a complete record "does not necessarily require reversal. Rather, an incomplete or non-verbatim record . . . raises a presumption of prejudice which the

Government may rebut." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (quoting *MCM*, app. 21 at A21-77 (1998 ed.)). If the omission is substantial, thereby raising a presumption of prejudice, the government may rebut the presumption by reconstructing the missing material. *See United States v. Garries*, 19 M.J. 845, 852 (A.F.C.M.R. 1985) (holding that the government rebutted the presumption of prejudice through reconstructed testimony), *aff'd*, 22 M.J. 288 (C.M.A. 1986). *But see United States v. Snethen*, 62 M.J. 579, 581 (A.F. Ct. Crim. App. 2005) (holding the reconstruction of the missing witness testimony was insufficient to overcome the presumption of prejudice, because of the importance of the lost testimony and arguments, the lengthy duration of the unrecorded portion of the proceedings, and the length of time between trial and reconstruction).

Applying these standards, we find the missing Defense motion in limine does not constitute a substantial omission. As an initial matter, it does not appear that the Defense motion was ever marked as an appellate exhibit, meaning the Government was not required to include it in the record of trial. Assuming the military judge should have marked the motion as an appellate exhibit, its omission did not render the record of trial incomplete. The substance of the Defense motion was discussed in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session. The thrust of the Defense's position was made clear on the record. In addition, we have found that the military judge erred in admitting this testimony (although we found no material prejudice to a substantial right resulting from the error). Therefore, as we have sided with Appellant on the issue he raised at trial, we see no way he could be prejudiced as a result of the omission of the written motion. We find Appellant is not entitled to relief on this issue.

## *XV. Issue XIV: Cumulative Effect of Errors*

Appellant avers that cumulative effect of the errors that occurred at trial should compel us to set aside the findings and sentence. As support for this position, Appellant cites the numerous assignments of error raised in his brief. He also asserts that the military judge failed to conduct sufficient analysis while ruling on several motions and objections, which should lead this court to decline to apply the standard presumption that military judges are presumed to know and follow the law.

As our sister court has observed, the law "requires us to evaluate the fairness of Appellant's trial using the cumulative error doctrine." *United States v. Parker,* 71 M.J. 594, 630 (N.M. Ct. Crim. App. 2012) (citing *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996); *United States v. Banks*, 36 M.J. 150, 171 (C.M.A. 1992)). We must evaluate the errors against the background of the whole case, giving particular attention to "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy of any remedial efforts); and the strength of the government's case." *Id.* (quoting *Dollente*, 45 M.J. at 242).

We have reviewed Appellant's assignments of error, including those raised pursuant to *Grostefon*. We have found only one non-prejudicial error involving the admission of testimony by Appellant's ex-wife pursuant to Mil. R. Evid. 404(b). Apart from this one matter, we have found no error (prejudicial or otherwise) in the military judge's rulings. The Government introduced ample evidence of Appellant's guilt on all charges and specifications, and Appellant was not denied a fair trial. Our finding of one prejudicial error does not warrant application of the cumulative error doctrine. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011); *Dollente*, 45 M.J. at 242.

## XVI.  Issue XV:  Ineffective Assistance of Counsel—Failure to Raise Legal Errors in Clemency

Appellant alleges that he received ineffective assistance of counsel when his trial defense attorneys did not raise any legal errors for the convening authority's consideration during clemency, even though the trial defense team raised 18 motions during trial. Applying the standard set forth in Issue II above, we summarily reject this assignment of error.

Counsel have broad discretion to determine the approach they believe will be most effective in petitioning for clemency; no requirement exists to allege legal errors simply because the issues were raised at trial. Trial defense counsel put together a voluminous and impassioned plea for clemency to the convening authority. Pursuant to this court's order, trial defense counsel also submitted declarations that explained their strategy for approaching the clemency request. They explained that, in their view, a more compelling approach was to focus on the impact of the findings and sentence on Appellant. This represents a reasonable approach, and this court "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). We find trial defense counsel were not ineffective in electing not to raise allegations of legal error to the convening authority. Even presuming they were ineffective, no prejudice resulted, particularly where we have found no basis for relief in any of the alleged legal errors raised at trial.

## XVII. Issue XVI:  Referral—Compliance with Rule for Courts-Martial 601(d)(2)(A)

Appellant alleges, pursuant to *Grostefon*, that the charges and specifications were improperly referred to a general court-martial. He asserts that he did not receive a full opportunity to cross-examine witnesses and have witnesses and evidence produced during the investigation. Therefore, he contends, the Government did not substantially comply with R.C.M. 405(f), which sets forth the rights of an accused at an Article 32, UCMJ, hearing.[35] In turn, he argues, the convening authority's referral of charges was deficient

---

[35] Article 32, UCMJ, 10 U.S.C. § 832 and R.C.M. 405 were revised subsequent to the investigation conducted in this case. All references in this opinion are to the versions in place at the time of Appellant's investigation.

because R.C.M. 601(d)(2)(A) provides that a convening authority may not refer a specification to a general court-martial unless there has been substantial compliance with R.C.M. 405.

Whether a court-martial possessed jurisdiction over an appellant is a question we review de novo. *United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005). Proper referral is a jurisdictional prerequisite to a court-martial. *United States v. Ballan*, 71 M.J. 28, 32 (C.A.A.F. 2012); R.C.M. 201(b)(3).

Appellant argues that the Government did not substantially comply with R.C.M. 405(f), because he requested the production of four witnesses at the investigatory hearing and both the special court-martial convening authority and the investigating officer denied the request. He also avers that his ability to cross-examine a Government witness was impaired because the witness repeatedly stated that he did not know the answers to certain questions the Defense posed. Finally, he protests that he repeatedly requested the production of the AFOSI report of investigation, but the Government did not provide this report until after the Article 32, UCMJ, investigation. We disagree that the Government failed to substantially comply with R.C.M. 405(f); therefore, we find no jurisdictional defect with the referral of this case to a general court-martial.

Appellant raised this issue before the military judge, who rejected the motion for a new Article 32, UCMJ, investigation. The military judge noted the following:

> There is no evidence that the Defense objected at the Article 32 hearing to any failure to provide the requested witnesses. The Defense did not submit the written objections prior to completion of the [investigating officer's] report. Nor did the Defense afterward submit objections to the Convening Authority.
>
> . . . .
>
> The Defense failure to make timely objection constitutes waiver under [R.C.M.] 405(k). And the Defense does not offer, nor can this Court find, "good cause for relief from the waiver."

Because Appellant did not object to the Article 32, UCMJ, investigation, Appellant's argument that the Government failed to substantially comply with R.C.M. 405(f) is waived.

Setting aside the issue of waiver, Appellant's claim fails on more fundamental grounds. Our review of the Article 32, UCMJ, investigation reveals that Appellant received ample opportunity to cross-examine witnesses and have witnesses and evidence produced. The witnesses he requested who were not produced at most could have testified

to their decision-making process in issuing the no-contact orders. However, the no-contact orders themselves contained ample detail about the reasons the orders were issued, and there is no reason to believe these witnesses would have added anything of significance to this issue. As to the AFOSI report of investigation, Appellant might not have been given the formal, finalized report, but key documents from that report were included in the investigation. The summarized witness statements provide no indication that the Defense was hampered in any way from representing Appellant at the investigatory hearing. As the military judge found, "At no time has the Defense made any showing as to how testimony of the requested witnesses, [or] the AFOSI investigatory material, would be relevant and non-cumulative. Nor is there any reason to believe that it would affect the referral decision of the convening authority." Appellant may now wish he had access to additional information or witnesses, but we have no trouble concluding that the Government complied with R.C.M. 405(f) and the convening authority was authorized to refer this case to a general court-martial.

## XVIII. Issue XVIII: Ineffective Assistance of Counsel—Failure to Object to the Article 32, UCMJ, Investigation

As an alternative argument to the issue immediately above, Appellant argues his trial defense counsel were ineffective by failing to file objections to the Article 32, UCMJ, investigation. He asserts that had his counsel filed such objections, the military judge would not have found that he waived his jurisdictional objection concerning the convening authority's referral decision. Applying the standards set forth in Issue II above, we find no ineffective assistance of counsel. The record reveals Appellant was ably represented at the Article 32, UCMJ, investigation. In fact, trial defense counsel's representation convinced the investigating officer to not recommend going forward on one serious charge and specification that had been preferred. The convening authority accepted this recommendation. We find that trial defense counsel's overall performance at the Article 32, UCMJ, hearing was not "unreasonable under prevailing professional norms." *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006). In addition, we find no prejudice to Appellant from any claimed ineffectiveness of counsel. As noted above, our decision as to the convening authority's referral does not rest on the lack of objection to the Article 32, UCMJ, investigation. Rather, Appellant failed to demonstrate that the requested witnesses were relevant, and there is no reason to believe he received anything less than a full and fair investigation. Appellant has not demonstrated that his counsel's failure to file objections to the Article 32, UCMJ, investigation represents ineffective assistance of counsel.

## XIX. Issue XIX: Statute of Limitations—Possession of Child Pornography

Charge I, Specification 1 alleged that Appellant wrongfully and knowingly possessed more than one digital image of minors engaging in sexually explicit conduct.

The charged time frame ran between on or about 2 July 2007 and on or about 12 March 2012. The summary court-martial convening authority signed for receipt of this charge and specification on 2 July 2012. Under Article 43, UCMJ, 10 U.S.C. § 843, the statute of limitations for this offense is five years before the receipt of charges by the summary court-martial convening authority. Appellant did not raise any issue concerning the statute of limitations for this charge and specification at trial. However, he now alleges that his conviction for this charge and specification violates the statute of limitations because the specification alleged that the misconduct began "on or about" 2 July 2007, leading to a possibility that he was convicted for misconduct that began more than five years before the receipt of charges. At a minimum, Appellant asserts that the military judge had an affirmative obligation to address this issue with Appellant on the record.

The interpretation of the statute of limitations is a question of law we review de novo. *United States v. Cimball-Sharpton*, 72 M.J. 777, 782 (A.F. Ct. Crim. App. 2013). On the one hand, "questions about whether certain conduct occurred within the limitations period or other relevant circumstances appear to be questions of fact. These preliminary fact decisions will not be reversed unless clearly erroneous." *United States v. Sills*, 56 M.J. 556, 562 (A.F. Ct. Crim. App. 2001) (quotation marks omitted), *vacated on other grounds*, 56 M.J. 239 (C.A.A.F. 2002). However, the rights accorded under the statute of limitations may be waived when the accused, with full knowledge of the privilege, fails to plead the statute in bar of the prosecution. *United States v. Toxell*, 30 C.M.R. 6 (C.M.A. 1960).

Regardless of the standard of review, Appellant cites two decisions by our superior court that he asserts required the military judge to sua sponte advise Appellant concerning the statute of limitations—*United States v. Salter*, 20 M.J. 116 (C.M.A. 1985) and *United States v. Thompson*, 59 M.J. 432 (C.A.A.F. 2004). He asserts that because the military judge did not so advise him, this court should review his complaint regarding the statute of limitations de novo. Under that standard, he asserts that the statute of limitations was violated because the evidence indicated Appellant may have possessed the images sometime prior to 2 July 2007. We reject Appellant's argument.

As an initial matter, we find the military judge had no sua sponte duty to advise Appellant concerning the statute of limitations. In *Salter*, the court reaffirmed its long-standing position that "'whenever it appears that the statute of limitations has run against an offense,' that fact will be brought to the attention of the accused by the court." *Salter*, 20 M.J. at 117 (quoting *United States v. Rodgers*, 24 C.M.R. 36, 38 (C.M.A. 1957)). This rule was designed to prevent the application of the waiver doctrine in a situation where "the record does not disclose that [the accused] was aware of that right." *Id.* Likewise, in *Thompson*, our superior court stated,

> When the evidence reasonably raises issues concerning a lesser-included offense or the statute of limitations, the military judge is charged with specific affirmative responsibilities. . . . The military judge has an affirmative obligation to advise an

accused of the right to assert the statute of limitations, and must
determine that any waiver of the statute of limitations bar is
both knowing and voluntary.

*Thompson*, 59 M.J. at 439 (citations omitted). This requirement is also captured in R.C.M. 907(b)(2)(B), which states that a charge or specification shall be dismissed upon motion if "[t]he statute of limitations (Article 43) has run, provided that, if it appears that the accused is unaware of the right to assert the statute of limitations in bar of trial, the military judge shall inform the accused of this right."

The principle set forth in these authorities provides Appellant no basis for relief. The charge and specification limited the charged time frame to the period of five years before the receipt of charges. Thus, to use the language from *Salter*, it did not appear that the statute of limitations had run, and the military judge had no obligation to advise Appellant concerning the statute of limitations (particularly when Appellant had already raised a statute of limitations motion concerning other charges and specifications). Under these facts, the military judge was not required to advise Appellant concerning the statute of limitations, because there was no reason for him to believe an issue regarding the statute of limitations was present.

Because the military judge was not required to advise Appellant regarding this issue, Appellant either waived or forfeited this issue by failing to raise this issue at trial. Even under a de novo review, however, we find no problem concerning the statute of limitations. The charge sheet properly limited the charged time frame to a period within the statute of limitations. Even if an argument could be made that the "on or about" language concerning the 2 July 2007 date created some theoretical possibility that Appellant was convicted of offenses that began before 2 July 2007, the facts of this case do not support such a concern. The Government's expert convincingly demonstrated that Appellant possessed these files well after 2 July 2007. We reject this assignment of error.

*XX. Issue XX: Denial of Request to Detail Individual Military Defense Counsel*

While the investigation was proceeding, Appellant submitted a by-name request to have Major (Maj) NM detailed as an individual military defense counsel. The Chief Senior Defense Counsel denied that request, noting Maj NM was stationed in California and the proceedings were in Florida. The Chief Senior Defense Counsel stated the distance, plus Maj NM's other responsibilities, precluded him from being reasonably available. Appellant appealed this decision to the Chief of the Trial Defense Division. That official granted the appeal, detailing Maj NM to represent Appellant.

While this matter was pending, Appellant submitted an additional by-name request to have Lieutenant Colonel (Lt Col) JP detailed to his defense team. Because Lt Col JP served as a Chief Senior Defense Counsel, the Chief of the Trial Defense Division was the decision-making official for this request. That official denied the request, noting that she

had instead detailed Maj MM, one of the division's "most seasoned defenders" and a person with "the qualifications and experience for the charges that have been referred to trial." The deciding official also cited the distance between Lt Col JP's home station and Tyndall AFB and Lt Col JP's workload as factors that influenced her decision.

At trial, Appellant challenged the decision to deny detailing Lt Col JP. The military judge found there was no abuse of discretion or impropriety in the deciding official's action. The military judge concurred that Lt Col JP was not reasonably available to serve as individual military defense counsel in this case. Appellant re-raises this challenge on appeal.

We examine the denial of requested counsel and the military judge's review of such denial for an abuse of discretion. *United States v. Anderson*, 36 M.J. 963, 973 (A.F.C.M.R. 1993).

Article 38(b), UCMJ, 10 U.S.C. § 838(b), provides that an accused may be represented "by military counsel of his own selection if that counsel is reasonably available," as determined under service regulations defining the term "reasonably available," and establishing procedures for making this determination. R.C.M. 506(b)(1) reiterates this direction, and sets out certain categories of persons not considered reasonably available because of the nature of their duties or positions. None of those categories applies to the instant case. R.C.M. 506(b)(1) then states that the service Secretary concerned "may determine other persons to be not reasonably available because of the nature or responsibilities of their assignments, geolineart considerations, exigent circumstances, or military necessity." R.C.M. 506(b)(2) provides that if the person requested does not fall within one of the categories listed as not being reasonably available, the convening authority shall forward the request to the head of the requested person's organization to make an administrative determination whether the requested person is reasonably available in accordance with service procedures. The rule provides, "This determination is a matter within the sole discretion of that authority."

Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ 5.4.2 (21 December 2007), set forth additional categories of persons not ordinarily considered to be reasonably available. Lt Col JP did not fall within one of these categories. The instruction provides that a counsel is reasonably available if "the appropriate approval authority determines the requested counsel can perform the duties . . . without unreasonable expense or detriment to the United States and without unreasonable delay in the proceedings." AFI 51-201, ¶ 5.4.3. That paragraph further provides the following factors for the approval authority to consider in making this determination:

> The duties, workload, and assignment status of the
> requested counsel;

The experience level, duties, and workload of the military counsel already detailed to represent the accused;

The nature and complexity of the charges and legal issues involved in the case;

Whether a certified assistant trial counsel is detailed to the case;

The workload of the office to which the requested counsel is assigned and the availability of personnel to meet those demands;

The distance from the expected site of the proceedings; and

Whether requested counsel is likely to be a necessary witness at trial or is otherwise conflicted from representing the accused.

We find no abuse of authority in the decision by the Chief of the Trial Defense Division to deny detailing Lt Col JP to Appellant's defense team. At the time the decision was made, Appellant was represented by an area defense counsel and a senior defense counsel. The deciding official specifically noted that she considered the criteria laid out in AFI 51-201, and the analysis contained in the denial memorandum supports this. The deciding official cited factors such as Lt Col JP's duties and workload, the experience level of military counsel already detailed to represent Appellant, and the distance from the expected site of the proceedings. Appellant may disagree with the deciding official's weighing of the relevant considerations, but under the broad discretion granted to decision makers in this area, more than mere disagreement is necessary for us to second-guess such a decision. The Chief of the Trial Defense Division did not abuse her discretion in declining to detail Lt Col JP to Appellant's defense team, and the military judge did not abuse his discretion in ruling against Appellant on this issue.

*XXI. Issues XXI and XXII: Admission of Evidence under*
*Mil. R. Evid. 702 and Ineffective Assistance of Counsel*

The searches of Appellant's computer media devices revealed explicit photographs of NR, some of them with an adult male. The adult male's face was not visible in the photographs, but the adult male's hands and penis were visible in some of the photographs. Appellant was charged with committing indecent acts toward NR based on the photographic evidence. To aid in proving these specifications, the Government called Mr.

Christopher Iber, a forensic examiner at the Federal Bureau of Investigation. Mr. Iber testified that his duties included comparison analysis, which involved comparing items depicted in photographs with other items. The Government established that Mr. Iber had specialized training and experience in this area, and proffered Mr. Iber as an expert in comparison analysis. Trial defense counsel did not object to this, and the military judge so recognized Mr. Iber. Mr. Iber then testified that he had compared the photographs of NR with a photograph of Appellant's hand. He testified that based on similar features between the two hands—such as knuckle creases, hand creases, and blemishes—in his opinion, the hands depicted in the two photographs were the same. Trial defense counsel did not object to this testimony. In cross-examination, trial defense counsel effectively explored the limitations of Mr. Iber's training and experience.

On appeal, Appellant alleges that the military judge erred in admitting Mr. Iber's testimony. Alternatively, he asserts that trial defense counsel were ineffective by failing to object to Mr. Iber's testimony. He asserts that Mr. Iber lacked qualifications to serve as an expert in comparison analysis and that Mr. Iber's testimony does not qualify as reliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). We disagree.

We review de novo the question of whether the military judge properly performed his or her gatekeeping function in ruling upon expert testimony. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). However, appellate courts normally review for an abuse of discretion the military judge's decision to permit a witness to testify as an expert, the limitations placed on the scope of the witness's testimony, and the enforcement of those limitations. *Id.* When an appellant does not object at trial, we review for plain error. *United States v. Green*, 55 M.J. 76, 81 (C.A.A.F. 2001). In general, "[t]he military judge has broad discretion as the 'gatekeeper' to determine whether the party offering expert testimony has established an adequate foundation with respect to reliability and relevance." *United States v. Allison*, 63 M.J. 365, 369 (C.A.A.F. 2006) (quoting *Green*, 55 M.J. at 80).

Mil. R. Evid. 702 sets forth the basic standard for expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, an expert "may testify if he or she is qualified and testimony in his or her area of knowledge would be helpful." *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005). "A suggested 'test' for deciding 'when experts may be used' is 'whether the untrained

layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject . . . ." *United States v. Meeks*, 35 M.J. 64, 68 (C.M.A. 1992) (alteration in original) (quoting FED. R. EVID. 702 advisory committee note).

In addition, military courts apply the factors set forth in *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993) in determining whether to admit expert testimony. Those factors are: (1) the qualifications of the expert, (2) the subject matter of the expert testimony, (3) the basis for the expert testimony, (4) the legal relevance of the evidence, (5) the reliability of the evidence, and (6) whether the probative value of the testimony outweighs other considerations. *Id.* at 397. It is not necessary to satisfy each of the *Houser* factors; the "gatekeeping inquiry must be tied to the facts of a particular case." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). *Houser*, which was issued before the Supreme Court's decision in *Daubert*, is consistent with *Daubert* and remains a valid test for determining the admissibility of expert testimony. *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999). The *Daubert* criteria for determining the reliability of expert testimony are: (1) whether the technique can be, and has been, tested; (2) whether the technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and whether standards exist to control the technique's operation; and (4) whether the technique enjoys general acceptance within the relevant expert community. *Daubert*, 509 U.S. at 593–94.

Trial defense counsel did not object to Mr. Iber's testimony; therefore, the military judge did not place his analysis of the *Houser* factors on the record. By failing to object to Mr. Iber's testimony at trial, Appellant, at a minimum, forfeited this issue. Under a plain error analysis, we find no error in admitting Mr. Iber's testimony. Appellant properly notes certain limitations in Mr. Iber's qualifications such as his lack of certification. These limitations were explored effectively in cross-examination. However, Mr. Iber had been employed as a photographic technologist for nine years, attended a two-year training program, engaged in professional development activities, engaged in extensive comparison analysis as part of his duties, and previously testified as an expert in comparison analysis four times. His qualifications were sufficient that his opinion could be helpful to the factfinder. He appropriately limited his testimony to his study of the photographs at issue, and the issue of whether the male hand in the pictures was that of Appellant was of central relevance to these specifications. Particularly in this military judge-alone trial, there was minimal to no concern of unfair prejudice or similar issues. The expert's opinion was supported by testimony comparing specific items in the photographs, demonstrating that it was Appellant's hand in the photographs of NR.

Appellant did not request a *Daubert* hearing, so the record is not well developed as to whether techniques used in Mr. Iber's comparison analysis are sufficiently reliable under that standard. However, Mr. Iber did testify that all his work is peer reviewed. Ultimately, his testimony only involved pointing out matching characteristics of the two sets of

photographs, and then offering his opinion that the two sets of photographs depicted the same hand. We see no reason why these techniques would present any concern under *Daubert*. The military judge committed no error in not sua sponte excluding Mr. Iber's testimony.

Additionally, even presuming error in allowing Mr. Iber to testify, we find no prejudice from such error. A layperson's examination of the two sets of photographs easily reveals similarities between the hands depicted in each set. Mr. Iber's testimony only identified specific features of the hand in the photographs and added his opinion that, based on these features, the hand in each set of photographs belonged to the same person. In addition to a layperson's examination of the photographs, the Government could rely on the following evidence: (1) the photographs of NR were found on Appellant's computer; (2) Appellant was the "big brother" of NR's brother and NR often came on outings; (3) the bed sheets and headboard in the photograph matched the distinctive sheets and headboard taken from Appellant's bedroom; and (4) the metadata from the photographs found on Appellant's computer revealed that the images were taken during times when Appellant was known to be caring for NR and NR's brother. Mr. Iber's testimony was helpful to the factfinder, but it was hardly necessary to demonstrate beyond a reasonable doubt that Appellant committed indecent acts upon NR.

Finally, using the standard outlined in Issue II, we find Appellant received effective assistance of counsel on this issue. Trial defense counsel provided declarations on this issue. They explained that they did not object to Mr. Iber's testimony because they believed the similarities between the two sets of photographs was obvious to a layperson, and Mr. Iber's testimony was not necessary to prove the Government's case. Therefore, being able to cross-examine Mr. Iber about the limits of his training and expertise represented a better strategy than possibly excluding the testimony altogether and having the factfinder simply conduct his own analysis. Additionally, trial defense counsel observed that the threshold under Mil. R. Evid. 702 to qualify as an expert is low, and they believed Mr. Iber easily met this threshold. We find trial defense counsel's explanations sound, and we will not second-guess their tactical decisions. Additionally, they effectively cross-examined Mr. Iber and limited the impact of his testimony. Appellant received effective assistance of counsel on this issue.

*XXII. Issues XXIII and XXIV: March 2012 Search Authorization and*
*Ineffective Assistance of Counsel*

Appellant's next assignment of error challenges the search authorization for his home and car on 12 March 2012. That search authorization was issued after Appellant was found in a car with AP in violation of a no-contact order. The affidavit accompanying the request for search authorization stated that based on Appellant's violation of the no-contact order, "it is believed that there is evidence of electronic communication between [Appellant] and [AP] within the residence and/or vehicle necessary to establish a meeting

between the two." Appellant alleges that this is a conclusory statement that fails to establish a substantial basis for the military magistrate to find probable cause.

The standard of review and governing legal authorities for this issue are generally set forth in Issue I.E. above. However, where an appellant has not challenged the admission of evidence at trial, he or she may prevail on appeal only by showing plain error. Mil. R. Evid. 103. To establish plain error, Appellant must demonstrate that (1) there was error, (2) the error was plain or obvious, and (3) the error materially prejudiced a substantial right. *United States v. Olano*, 507 U.S. 725, 732–35 (1993). If Appellant has intentionally relinquished a known right at trial, as opposed to merely failing to assert a right, the issue is waived, and Appellant has lost the right to raise the issue on appeal. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009).

Appellant did not challenge this issue at trial. At a minimum, therefore, he has forfeited this issue. The Government asserts that Appellant waived this issue rather than forfeited it because he never challenged the search authorization despite raising numerous other motions—including other Fourth Amendment challenges. We need not decide whether Appellant waived rather than forfeited this issue because, even assuming Appellant only forfeited it, we find no plain or obvious error in the admission of evidence resulting from the 12 March 2012 search authorization. Appellant was observed violating a no-contact order by riding in a car with AP. It is reasonable to believe that this meeting did not occur spontaneously and Appellant and AP recently communicated to set up this meeting. We find no plain error in the admission of this evidence.

Appellant also alleges his trial defense counsel were ineffective by failing to raise an objection to the admission of this evidence at trial. The Government submitted a declaration from one of the trial defense counsel stating that this evidence was not challenged because counsel believed probable cause existed for the search authorization.

Appellant later filed a motion to submit documents and a motion for leave to file a supplemental assignment of error concerning this issue. These motions were filed after this court had returned the record of trial to the convening authority to conduct the *DuBay* hearing necessitated by Issue II. We granted both motions while the record of trial was with the convening authority.

The Government then moved for reconsideration en banc, asserting that this court was without jurisdiction to grant the motions because the case was with the convening authority. We delayed action on the Government's en banc reconsideration motion to address this matter in this opinion. Having done so, we deny the Government's motion. The court declined to consider this matter en banc. Likewise, this panel declined to reconsider the granting of Appellant's motions. This matter had no bearing on the issue being addressed in the *DuBay* hearing. As a result, the Government's concern that it would have to simultaneously litigate this case in two forums was unfounded. In addition, our

ultimate decision to grant the motions to supplement the record results in no prejudice to the Government.

Having considered the supplemental assignment of error and the documents Appellant moved to submit, and applying the standards set forth in Issue II above, we find no ineffective assistance of counsel. "When an appellant argues that counsel was ineffective for erroneously waiving a motion, it makes sense to deny the claim if Appellant would not be entitled to relief on the erroneously waived motion, because the accused cannot show he was harmed by not preserving the issue." *United States v. Bradley*, 71 M.J. 13, 17 (C.A.A.F. 2012). We see no basis for suppressing evidence found pursuant to the search authorization. The failure to object to this issue at trial prevented the record from being fully developed on this matter, but the record demonstrates that AFOSI informed the military magistrate that Appellant was found riding in a car with AP in violation of a no-contact order. Under plain error review, Appellant bears the burden of showing that the magistrate did not have a substantial basis to believe that evidence of electronic communication would be found in the premises to be searched. Common sense suggests that the two communicated to set up their meeting, and there was substantial evidence that the two had an extensive record of communication by electronic means. Even if trial defense counsel had moved to suppress this evidence, our analysis would remain the same on appeal. In any event, trial defense counsel vigorously represented Appellant at trial and successfully moved to dismiss 7 of the 17 referred specifications. Appellant has not met his burden of demonstrating that his counsel were ineffective.

*XXIII. Issue XXV: Legal and Factual Sufficiency—Violation of No-Contact Orders*

Appellant alleges his convictions of three specifications of failing to obey a lawful order are legally and factually insufficient. He contends that the evidence failed to demonstrate that he committed the offenses "within the continental United States," as charged. Instead, he asserts that the charged misconduct occurred when he sent text and Facebook messages, and the Government introduced no evidence that he sent these messages while in the continental United States.

Applying the standards set forth in Issue VII, we find Appellant's conviction of these three specifications legally and factually sufficient. The record convincingly demonstrates Appellant was in Florida throughout most, if not all, of the charged time frame. The relevant messages the Government introduced contain no indication that Appellant was out of the country, and in many instances the messages indicate he was at his home station in Florida. Witness testimony and cell phone records also support the Government's contention that Appellant committed the charged misconduct while in the continental United States. Viewed in the light most favorable to the Government, a reasonable factfinder could have found Appellant guilty of all elements of these offenses beyond a reasonable doubt. Similarly, after weighing the evidence in the record of trial

and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

*XXIV. Issue XXVII:  Article 13, UCMJ*

At trial, Appellant moved to receive administrative credit for alleged illegal pretrial punishment.  His motion cited several conditions of his pretrial confinement; the military judge's ruling found the following facts relevant to this issue.

1. On or about 12 March 2012, the accused was placed in pretrial confinement at Tyndall AFB, FL.  On or about 23 April 2012, the accused was transferred to the Bay County Jail in Panama City, FL.

2. Arriving at the Bay County Jail, the accused was involved in booking and intake procedures.  At that time, medical personnel determined he may be a suicide risk.  The accused then spent roughly three days in a suicide watch area known as "C-2."  C-2 was a relatively austere environment where, for their own safety, inmates were given so[-]called "boat beds" resting on the floor, were required to eat their meals without the use of utensils, and underwent other restrictions.

3. The accused was then transferred to the "C-1 Pod" at the Bay County Jail.  The C-1 Pod is a "protective custody" area with a day room and about 12 cells, capable of handling up to two detainees per cell.  The accused's case is one that had received considerable media attention in the local area.  For this reason, and because of the nature of the offenses the accused was alleged to have committed, Bay County Jail officials placed the accused in the C-1 Pod out of concern for his safety.  Detainees in the protective custody pod receive special protection, including different uniforms from general population, so that jail staff can easily identify them as detainees who cannot have contact with general population.

4. The accused has remained assigned to the C-1 Pod from late April 2012 to the present.  While assigned to the C-1 Pod, the accused has experienced a number of inconveniences or hardships:

a. *Leaky Roof.*  For years, the Bay County Jail has had problems with a leaky roof (now under repair).  From April to July 2012, the accused's cell experienced water leaks when it

rained. The accused was assigned to the lower of two bunks, and thus his bed was protected from leaks and only got wet on one occasion. But water dripped from light fixtures and other sources, requiring him to "squeegee" it repeatedly from his cell. In July 2012, the accused filed a formal complaint with jail authorities, and he was then moved to [a] cell in the C-1 Pod with no water leaks.

b. *Commingling*. Typically the C-1 Pod population is about twenty detainees. Precise data were not available, but among these detainees there were commonly several—perhaps one-fourth—who had been convicted and sentenced, and were awaiting transfer from the jail to long term incarceration with the State Department of Corrections. From about 10 November 2012 to 10 February 2013, the accused shared a cell with an individual who was, at or about that time, convicted and in the process of being sentenced and transferred from the C-1 Pod.

c. *Fitness and Recreation*. The C-1 Pod had a day room with television and games available, which the detainees were allowed to access from 0500-2230 daily. Members of the C-1 Pod were allowed roughly three hours per week of outdoor recreation. The outdoor facility provided C-1 Pod detainees was a small enclosed pen, without the equipment and other exercise opportunities allowed the general jail populace.

d. *Health Care.* During his stay of approximately ten months in the Bay County Jail, the accused has been afforded roughly twenty visits for medical and other health care. His overall treatment opportunities have been satisfactory, but he has experienced interruptions in some of his scheduled appointments and in the receipt of certain allergy medications.

e. *Heating*. In December 2012, for a period of about two weeks, the local area experienced a cold spell. The heating system at the Bay County Jail had difficulty accommodating the change in temperature. [D]etainees in the C-1 Pod endured temperatures at or about 60 degrees.

In the analysis section of the ruling, the military judge concluded that "there was no purpose or intent by any governmental authority to punish the accused, and that there was no imposition of punishment prior to trial."

The military judge found no violation of Article 13, UCMJ. However, the military judge found that Appellant was entitled to 75 days of confinement credit under R.C.M. 305(k) and *United States v. Adcock*, 65 M.J. 18 (C.A.A.F. 2007), for the unusually harsh circumstances he experienced. Appellant now challenges the portion of the military judge's ruling denying relief under Article 13, UCMJ. In addition to the matters specifically discussed in the military judge's ruling, he alleges other harsh conditions of his pretrial confinement, including denial of access to legal resources, denial of access to medical care, harassment by a guard, and instances when he was made to wear prisoner clothing outside the jail. Some of these issues are raised for the first time on appeal.

Article 13, UCMJ, prohibits the intentional imposition of punishment on an accused before trial and pretrial confinement conditions that are more rigorous than necessary to ensure the accused's presence at trial. *United States v. Inong*, 58 M.J. 460, 463 (C.A.A.F. 2003). The ultimate issue of unlawful pretrial punishment presents a mixed question of law and fact. *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997) (citing *Thompson v. Keohane*, 516 U.S. 99, 111–12 (1995)). The specific question of whether an appellant was subject to the intentional imposition of punishment before trial "entails a purpose or intent to punish an accused before guilt or innocence has been adjudicated." *Id.* Therefore, on such "'basic, primary, or historical facts' we will defer to the trial judge who is in the best position to evaluate them, and on those points, we will reverse only for a clear abuse of discretion." *Id.* (quoting *Thompson*, 516 U.S. at 110).

The military judge issued thorough, well-supported findings of fact concerning Appellant's motion at trial. Appellant has raised no serious challenge to these findings of fact, and we see no clear error in them. The Government called an official from the Bay County Jail in motions practice, and he convincingly testified that the facility has suffered from long-term maintenance issues that impacted Appellant. He also convincingly testified that jail officials took reasonable steps to alleviate the effects of these issues on Appellant and that Appellant was never singled out or made the object of punishment. As to the alleged delays or interruptions in medical care, the military judge saw nothing particularly egregious about these issues, and neither do we. Appellant was provided sufficient care by military medical standards. As to the issues Appellant raises for the first time on appeal, even assuming Appellant has not waived his right to raise these issues by his failure to do so at trial, we see nothing about these matters to indicate government officials intended to punish Appellant. Appellant no doubt suffered to some extent as a result of the conditions of his pretrial confinement, and the military judge recognized this by granting him confinement credit under R.C.M. 305(k). However, the military judge's conclusion that no intent to punish existed is well supported and his decision not to grant relief does not represent a clear abuse of discretion.

*XXV. Issue XXVIII: Article 55, UCMJ*

Finally, Appellant alleges that the conditions of his post-trial confinement violated Article 55, UCMJ. He asserts that he did not receive adequate treatment in the Bay County Jail for chronic medical conditions (allergies and vertigo), and that the deliberate indifference to these medical conditions constituted cruel and unusual punishment. We disagree.

We review de novo allegations of cruel and unusual punishment. *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001). Both the Eighth Amendment[36] and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55, UCMJ, is apparent. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). A violation of the Eighth Amendment is shown by demonstrating: "(1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [Appellant's] health and safety; and (3) that [Appellant] has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ." *Id.* (footnotes and quotation marks omitted).

An appellant is entitled to reasonable medical care for serious medical conditions. *United States v. McPherson*, 72 M.J. 862, 873 (A.F. Ct. Crim. App. 2013), *aff'd*, 73 M.J. 393 (C.A.A.F. 2014). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 103–04 (citation omitted). In determining whether an appellant's medical needs are "serious," we examine whether the medical needs involve "serious health risks." *McPherson*, 72 M.J. at 873 (quoting *United States v. Haymaker*, 46 M.J. 757, 761 (A.F. Ct. Crim. App. 1997)). "Denial of adequate medical attention can constitute an Eighth Amendment . . . violation. A failure to provide basic . . . care can constitute deliberate indifference. However, it is not constitutionally required that health care be 'perfect' or 'the best obtainable.' [An appellant is] entitled to reasonable medical care, but not the 'optimal' care recommended . . . ." *White*, 54 M.J. at 474–75 (citations omitted).

To prevail, Appellant must show: (1) he has exhausted administrative remedies, under both the confinement grievance system and in accordance with Article 138, UCMJ; (2) prison officials committed a "sufficiently serious act or omission" that denied him necessities; and (3) the act or omission resulted from a culpable state of mind reflecting

---

[36] U.S. CONST. amend. VIII.

deliberate indifference by confinement officials to Appellant's health and safety. *Lovett*, 63 M.J. at 215. We look objectively at whether an act denied a prisoner his necessities, while we subjectively test the state mind of the prison officials. *United States v. Brennan*, 58 M.J. 351, 353 (C.A.A.F. 2003).

Assuming that Appellant satisfies the first prong of the *Lovett* test of exhausting administrative remedies,[37] we find his claim fails on the second prong. Appellant's submissions demonstrate that he was confined at the Bay County Jail for 33 days. Even assuming that Appellant did suffer from allergies and vertigo, and that he received no medication for these conditions, we find no evidence in the record that he faced any "serious health risks" as a result of this denial of care for a relatively short period of time, and we have no reason to believe this is the case. Appellant has not alleged sufficient facts to allow us to conclude that he faced the possibility of "further significant injury or the unnecessary and wanton infliction of pain" as a result of his short-term denial of medication for these medical conditions. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quotation marks omitted). Appellant has not satisfied his burden of demonstrating that prison officials committed a sufficiently serious act or omission that denied him necessities; thus, he is not entitled to relief on this issue.

*XXVI. Additional Issue: Appellate Delay*

This case was docketed with this court on 20 May 2013, meaning more than 35 months have passed between docketing and this opinion. The appellate delay in this case exceeds the standards set forth in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006).

We review de novo claims that an appellant was denied his due process right to a speedy post-trial review and appeal. *Moreno*, 63 M.J. at 135. In conducting this review, we assess the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay, (2) the reasons for the delay, (3) Appellant's assertion of the right to timely review and appeal, and (4) prejudice. *Id*. There is a presumption of unreasonable appellate delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id*. at 142. If the appellate delay in a given case does not rise to the level of a due process violation, this court may nonetheless exercise its broad authority under Article 66(c), UCMJ, to grant sentence relief even in the absence of a showing of material prejudice. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

---

[37] The Article 138, UCMJ, 10 U.S.C. § 838, complaint Appellant attached to his appeal was denied. A denial letter notes that Appellant did not file the complaint until 255 days after his alleged improper post-trial confinement ended. Appellant claims that he pursued redress with confinement officials after the conditions ended, but has not attached any evidence of such.

We decline to grant sentence relief in this case. Having analyzed the four *Barker* factors, we find the delay in rendering this opinion does not constitute a due process violation. We also find that *Tardif* relief is not appropriate in this case.

We note the following factors that particularly guided our analysis on this point: (1) this case involved unusually voluminous and complex issues, with the record of trial filling 17 volumes (including more than two full volumes of post-trial and appellate documents) and 31 raised issues; (2) Appellant himself was responsible for a portion of the delay due to his untimely and repeated *Grostefon* submissions and his decision to hire civilian counsel 15 months after the case was docketed; (3) the numerous allegations of ineffective assistance of counsel required procurement of responsive affidavits or declarations; (4) Appellant requested and was granted oral argument in this case, but oral argument could not be scheduled for more than two months after the motion was granted due to civilian appellate defense counsel's schedule; (5) a *DuBay* hearing was necessary to adequately address one of Appellant's allegations of ineffective assistance of counsel; and (6) Appellant requested, and was granted, a second oral argument after the *DuBay* hearing. This court conducted several status conferences and took all appropriate measures to move this case to completion.

We are confident that the numerous orders this court issued in this case sufficiently demonstrate that the court has vigorously exercised its responsibility to timely review this case. Therefore, Appellant is not entitled to relief based on the fact that more than 18 months elapsed after docketing until today's opinion.

## XXVII. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court